434 S.E.2d 707

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Kevin J. DORISIO, Defendant Below, Appellant.**

**No. 21461.**

Supreme Court of Appeals of West Virginia.

Submitted May 4, 1993.

Decided July 22, 1993.

Darrell V. McGraw, Jr., Atty. Gen., Jacquelyn I. Custer, Asst. Atty. Gen. Charleston, for appellee.

Daniel L. McCune, Selitti & Nogay, Weirton, for appellant.

PER CURIAM:

The appellant, Kevin J. Dorisio, appeals from the December 13, 1991, Circuit Court of Brooke County order which sentenced him to ten years in prison after he was convicted of aggravated robbery.

The Mom and Pop Quick Stop in Colliers, West Virginia, was robbed at approximately 10:45 a.m. on June 6, 1990. A young man who was later identified as the appellant entered the store, bought some food, asked for directions, and then left. He soon returned, and this time he placed a bag of tortilla chips on the counter, threw a substance into the store clerk's eyes, and grabbed $153.50 from the cash register.

The clerk, Louise McCullough, managed the store for her brothers, and she was the only employee working that morning. With her eyes burning intensely, she managed to get into her house, which adjoined the store. She barricaded the door and called her brother. Because the substance which irritated her eyes also made it difficult for her to breathe, she went out on her porch to get fresh air, at which time she heard a car spinning in the store's gravel parking lot and then glimpsed a red car speeding away.

At this same time, Lisa Collins was walking beside the store, and she saw Ms. McCullough on the porch gasping for air. She also witnessed a man wearing blue jeans, t-shirt, ball cap, and sunglasses slip in the gravel of the parking lot as he ran to get into a car which she described as a small, red Geo.

After the robbery, the Brooke County Sheriff's Department put out a description of the robber and his car and asked law enforcement agencies in nearby jurisdictions to be on the lookout for him.

Earlier on that same morning of June 6, 1990, at approximately 9:15 a.m., Janice Miller, a teller at Gallatin National Bank near Hickory, Pennsylvania, saw a man wearing a t-shirt, jeans, red baseball cap, and dark sunglasses enter the bank carrying a brown grocery bag folded up in his hand. This man first caught Miller's attention when he parked his car horizontally along the side of the bank building instead of pulling into a regular parking stall. Miller described the bank as a small mobile unit: "It's not a permanent structure. It's basically like a trailer. It's not very big at all. Only employs three people. The front of the building has an all glass lobby, so it's very visible. The parking lot is very visible from the inside of the building." Miller said she paid particular attention to the man because he sat in his car for approximately twenty minutes without doing anything, and she felt this was suspicious behavior. In addition, Miller explained that she knew all of the bank's customers and their cars: "It wasn't a familiar vehicle. I'm trained to notice things like this. It was a brand new vehicle, very shiny, so it caught your attention, red, and I even had a customer comment to me and say, why is that man parked like that in the parking lot?"

Once he was inside the bank, Miller observed the man from a distance of approximately six to seven feet as another teller waited on him. Miller noticed that he was wearing a gold chain with a charm on it around his neck and that he had two gold earrings in his left ear. The man asked about CD rates and was directed to a display board where the rates were posted. The board was located directly beneath the bank's surveillance camera. Although the camera was not turned on at the time, this was not apparent from looking at it. The man left the bank and drove away in what Miller described as a candy-apple red Geo Storm. Although Miller took a pen and paper and tried to get the car's license number, she noticed that it did not have a license plate.

Miller immediately called the Pennsylvania State Police to report her suspicions that the man was casing the bank. A trooper was sent to take her statement,

and she described the man, his clothing, and the red Geo he was driving. The Brooke County Sheriff's Department subsequently learned that a man matching the description of the Mom and Pop Quick Stop robber had reportedly been casing the Gallatin National Bank earlier that same morning of June 6, 1990. An investigating officer determined that the driving time from the bank to the store in Colliers was between 27 and 31 minutes, with mileage of either 18.4 miles or 20.95 miles, depending upon the route.

On June 23, 1990, the bank teller, Miller, met with Richard Vulgamore, a special investigator for the Brooke County Prosecuting Attorney, to create a composite drawing of the man she had described to the Pennsylvania State Police. Vulgamore also met with the store manager, McCullough, in hopes of developing a composite of her assailant. After McCullough was released from the hospital on June 6, she and Vulgamore worked for two sessions totalling around six hours. They met again on June 24. Although one composite was completed, McCullough apparently was not satisfied that it was a good likeness of the man who attacked her and robbed the store.

After McCullough expressed displeasure with the accuracy of her first composite, Vulgamore showed her the composite he created from Miller's description of the man she saw at the bank. He did not tell McCullough anything about the origins of this composite.

McCullough felt that Miller's composite more closely resembled her own assailant's appearance, and they used this to start a second composite. Using a computer, Vulgamore removed the facial hair and jewelry from the Miller composite, because McCullough was not certain that her assailant had either. McCullough was more satisfied with the accuracy of the second composite.

While working on an unrelated case on June 26, 1990, Vulgamore showed the composites to members of the Weirton Police Department. Detective Ronald Haggerty immediately commented that the composite looked like the appellant, Kevin Dorisio. The appellant's picture was then included in a photo array, and his fingerprints were forwarded to the FBI for comparison with any prints found on the bag of tortilla chips or the cash register drawer.

The photo array was subsequently shown to Miller, and she identified a photograph of the appellant as the man she saw leave the bank in a red Geo on June 6, 1990. At a May 7, 1991, preliminary hearing, Miller also made an in-court identification of the appellant as the man who "came into the bank that morning on June 6, and sped away in the red Geo" and who she had previously "identified in the photographic array."

McCullough also picked the appellant out of the photo array. At the preliminary hearing, she commented that he "didn't look big enough" to be her assailant, but later, as she was leaving the preliminary hearing, she said she was able to see "this same red, ruddy skin on his arms." At trial, she testified that she was now certain the appellant was the same person who threw the substance in her face and robbed her.

As we noted above, the appellant's fingerprints were forwarded to the FBI to be compared with any prints that might be recovered from the tortilla chip bag or the cash register drawer. Although no usable prints were obtained from the drawer, the FBI identified three fingerprints from the tortilla chip bag as those of the appellant.

On June 23, 1990, the appellant's fiancee, Jamie King, filed a stolen vehicle report with the Weirton Police Department. According to her, the red 1990 Geo Storm two-door hatchback she had been driving was stolen while she and the appellant were in a local club. Although King used the car regularly, it was registered to her grandfather. A week after it was reported stolen, the police recovered what was left of the Geo, which had been burned.

A warrant for the arrest of the appellant, Kevin J. Dorisio, was issued on July 12, 1990. Four days later, the appellant returned from Ohio and turned himself in to

the Brooke County Sheriff's Department. During trial testimony, corrections officer Clarence Barnhart recalled that while the appellant was in jail prior to his hearing before a magistrate, he made a statement that he planned to

> ... sue us because we took him from a job out in Ohio, brought him down to this jail for a robbery that he was supposed to do out in Colliers and he didn't even know where Colliers was, or where the little country store was.

However, the appellant and his brother both subsequently testified that the appellant had been in the store on numerous occasions. In fact, the appellant indicated that the presence of his fingerprints on the tortilla chip bag could be attributed to his handling of the bag on a previous visit to the store.

On appeal, the appellant asks this Court to reverse his conviction. He assigns several related errors which address so-called "collateral crimes" testimony, as well as other evidence that the appellant feels should have been inadmissible. On April 22, 1991, and May 7, 1991, *in camera* hearings were held on the appellant's motion to suppress this type of evidence. The lower court determined that, among other things, testimony concerning the appellant's alleged presence at the bank earlier on the same morning of the grocery store robbery and the suspected arson of a red Geo automobile would be permitted.

The appellant argues first that the trial court erred in refusing to give the jury a limiting instruction concerning Janice Miller's testimony about the events at Gallatin National Bank. The appellant now maintains that Miller's testimony was tantamount to other crimes, wrongs or acts evidence under Rule 404(b) of the West Virginia Rules of Evidence. Therefore, the appellant argues that the lower court should have instructed the jury not to consider collateral crimes/wrongful acts evidence as an indication of the defendant's guilt of the crime charged.

The appellant states that it was clear from Miller's testimony that she "opined that Kevin Dorisio was in the Gallatin National Bank to rob the bank." However, the State points out that the trial court admonished the jury to ignore Miller's opinion and ordered that her statement be stricken from the record. Further, the State argues that the appellant mischaracterizes Miller's testimony as evidence of collateral crimes or acts which are barred by Rule 404(b).

A careful review of the record in this case reveals that during an in chambers discussion about jury instructions, defense counsel was, in the words of the trial judge, "not crazy about" the court giving a collateral crimes instruction. Defense counsel apparently felt that such an instruction would tend to emphasize the bank incident. If it was to be given at all, defense counsel wanted to limit the limiting instruction by omitting any reference to the fact that the jury could consider collateral crimes evidence when deciding whether an element of the offense charged had been proven.[1]

Rule 404(b) of the West Virginia Rules of Evidence states that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. *It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-*

---

1. In *State v. Dolin,* 176 W.Va. 688, 696, 347 S.E.2d 208, 216 (1986), we explained that:

> ... from a procedural standpoint evidence admitted under one of the collateral crime exceptions is thought to be relevant to some aspect of the State's case. Such evidence is not admitted as proof of the ultimate guilt of the defendant. For this reason, it is customary to give the jury a limiting instruction with regard to its consideration of the collateral

crime. This instruction generally provides that the evidence of a collateral crime is not to be considered as proof of the defendant's guilt on the present charge, but may be considered in deciding whether a given issue or element relevant to the present charge has been proven. When a defendant requests this limiting instruction, it must be given.

*See also State v. Pancake,* 170 W.Va. 690, 694, 296 S.E.2d 37, 41 (1982).

*edge, identity, or absence of mistake or accident.* (Emphasis added.)

■ In this case, there was never a bank robbery. As a result, the appellant's alleged presence at the bank did not technically constitute either a "collateral crime" or a "wrongful act," nor even "uncharged misconduct." Rather, the defendant's "act" consisted of sitting in a bank parking lot for twenty minutes before walking into the bank carrying a paper bag, behaving in a nervous manner that a teller considered suspicious, and driving away in a red Geo that did not have a license plate. As described by Miller, what happened at the bank on the morning of June 6, 1990, might best be termed a "suspicious incident."

We would point out that Miller's testimony about the appellant's appearance at the bank was not introduced to show either his propensity or his disposition to commit a crime. Instead, the State represented that Miller's testimony that she saw the appellant in the bank on the morning of the robbery was necessary because it established the appellant's presence at a location so near in time and place to the robbery that the jury could infer that he had the opportunity to commit the robbery. We agree and find that in addition to showing opportunity, Miller's testimony was also admissible for purposes related to identification.

Consequently, we conclude that it was unnecessary for the trial court to give the jury a limiting instruction, particularly an edited version, pertaining to Miller's testimony about the suspicious incident at the bank. This is especially true when we consider that defense counsel apparently did not really want an instruction that might tend to magnify the incident in the minds of jurors. We find no error on this point.

In another assignment of error, the appellant objects to the fact that the photograph of him which appeared in the photo array was a snapshot taken by a police officer. Detective Powell of the Weirton Police Department testified at trial and provided a foundation for the introduction of the photo array which was used to identify the appellant:

Q. Did you have any contact with [the defendant] in 1990 that resulted in him having a photograph taken in your presence?

A. Yes, sir.

Q. Can you tell us, generally, when that happened?

A. I believe it was the middle of June, I believe the 12th of June was the day the actual picture was taken.

Q. All right. And who all was present when it was taken?

A. Let's see; there was a Trooper Frank Keenan from the Pennsylvania State Police that actually took the picture, and there were two other subjects; one was a State Police officer and one other subject with those two.

The appellant moved to strike Detective Powell's final response and also moved for a mistrial. Both motions were denied. While Detective Powell commented that Trooper Keenan took the photo "for his use in an investigation," he said nothing else about the investigation or how the appellant's photo was connected to the investigation.

The State argues that the mere fact that the photo in the array was taken by a police officer does not make it evidence of other crimes, wrongs, or acts that is inadmissible under Rule 404(b). Moreover, the State maintains that Powell's testimony was necessary to establish the events surrounding the development of the photo array, as well as the appellant's subsequent identification by police officers who were participating in investigations totally unrelated to the appellant.

■ "Rules 402 and 403 of the *West Virginia Rules of Evidence* [1985] direct the trial judge to admit relevant evidence, but to exclude evidence whose probative value is substantially outweighed by the danger of unfair prejudice to the defendant." Syl. pt. 4, *Gable v. Kroger Co.,* 186

W.Va. 62, 410 S.E.2d 701 (1991).[2] "Such decisions are left to the sound discretion of the trial judge...." *Id.* 186 W.Va. at 66, 410 S.E.2d at 705. In this instance, we find that the potential for any prejudicial impact by Detective Powell's oblique reference to another unspecified investigation was slight. Furthermore, any prejudice must be weighed against the probative value of the appellant's presence in the photo array. In this case, we conclude that the probative value of the evidence clearly outweighs any discernable prejudicial impact.

The appellant also objects to the admission of testimony by Patrolman Terrance Brown that the red Geo automobile owned by the appellant's wife's grandfather was reported stolen and found burned seventeen days after the robbery. The appellant contends that a link to the commission of a collateral crime must be established in order for such testimony to be admissible. Therefore, the appellant argues that this evidence was irrelevant and inadmissible under Rules 402 and 404(b) of the Rules of Evidence.

█ The appellant incorrectly argues that any evidence related to the red Geo was irrelevant and inadmissible. "The general rule is that the State, in a criminal case, may not introduce evidence of a substantive offense committed by the defendant which is separate and distinct from the specific offense charged in the indictment." Syl. pt. 1, *State v. Moubray,* 139 W.Va. 535, 81 S.E.2d 117 (1954). "The exceptions permitting evidence of collateral crimes and charges to be admissible against an accused are recognized as follows: the evidence is admissible if it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; and (5) the identity of the person charged with the commission of the

crime on trial." Syl. pt. 12, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974).

█ In this case, there was no testimony or other evidence introduced which would indicate that the appellant burned the car. However, the fact that the appellant was identified as the driver of a red Geo that was seen at both the bank and the store in Colliers on June 6, 1990, was a key piece of evidence in this case. The State established that the appellant's fiancee had the use of a red Geo which was registered to her grandfather and that she reported the car as stolen on June 23, 1990. This evidence was relevant because it also established that the appellant had access to the car. At no time did the State "introduce evidence of a substantive offense committed by the defendant which is separate and distinct from the specific offense charged...." *Id.* The fact that the red Geo was eventually found burned and that a juror might infer that the appellant destroyed evidence does not require the exclusion of testimony which establishes a key link between the appellant and the car. Even if the appellant was charged with arson in connection with the car, "this testimony was not used to show [his] propensity toward criminality, but rather it served to establish the identity of the person charged with the commission of the crime, and thus it is an exception to the collateral crime rule." *Acord v. Hedrick,* 176 W.Va. 154, 157–58, 342 S.E.2d 120, 123–24 (1986); *State v. Gum,* 172 W.Va. 534, 543, 309 S.E.2d 32, 41 (1983); syl. pt. 12, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974).

In another assignment of error, the appellant complains that the procedures used by Investigator Richard Vulgamore in drafting the composites were "overly suggestive" and that, as a result, any in or out-of-court identifications of the appellant obtained from the use of the composites created a substantial likelihood of misidentification and undermined any independent ba-

---

**2.** While Rule 402 of the West Virginia Rules of Evidence states, in part, that "[a]ll relevant evidence is admissible," Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

sis for identification. The appellant's argument on this point is totally without merit.

■ The State asks that if it is the appellant's contention that the composites were "overly suggestive," then it must also be asked, "suggestive of what or whom?" Courts ordinarily use the term "overly suggestive" to characterize police action which steers a witness to identify a specific suspect already targeted by the police. However, in this case, neither Vulgamore nor the two witnesses, McCullough and Miller, even knew the appellant when the composites were made. Consequently, there was absolutely no way that Vulgamore could have either directly or indirectly influenced either witness to identify the appellant. Even more significant, however, is the fact that Detective Haggerty, who was already familiar with the appellant, was the person who was finally able to put a name on the face created by Vulgamore's composites. We find nothing "overly suggestive" in the coincidental manner in which the appellant was ultimately identified by Detective Haggerty as a possible suspect.

Next, the appellant argues that the trial court erred in denying defense counsel an in-camera opportunity to question State's witness Janice Miller about her potential in-court identification of the appellant. Defense counsel maintains that letters to the trial court dated May 31, 1991, and July 19, 1991, sufficiently advised the court of their challenge to Miller's potential in-court identification.

■ Ms. Miller testified at an *in camera* hearing on May 7, 1991. Prior to this hearing, Miller had already made an out-of-court identification of the appellant from a photo array. However, the appellant now contends that "the gravamen of the May 7, 1991, hearing was the collateral crimes issue, therefore the identification was not in issue."[3] The State scoffs at this suggestion, pointing out that defense counsel had ample opportunity to examine Miller on the identification issue at the May 7 suppression hearing. Although technically the

hearing was set for discussion of the collateral crime issues, the State raised Miller's identification of the appellant from the photo array during direct examination. Thus, the State maintains that defense counsel waived the opportunity to question Miller regarding identification on May 7 and should not be permitted to complain now that "Miss Miller, on May 7, never identified Mr. Dorisio as that man." We agree.

■ The appellant never properly demanded an *in camera* identification hearing. Instead of filing a written motion to request an *in camera* hearing, the appellant conducted an informal correspondence with the court. Rule 47 of the Rules of Criminal Procedure provides in part that "[a]n application to the court for an order shall be by motion. A motion other than one made during a trial or hearing shall be in writing unless the court permits it to be made orally." Rule 49(a) requires that "[w]ritten motions ... shall be served upon each of the parties," while Rule 49(d) states that "[p]apers required to be served shall be filed with the court."

■ The State maintains that even a properly filed motion would not have entitled the appellant to an *in camera* hearing on Miller's potential in-court identification of the appellant in this instance, and we agree. "A defendant must be allowed to examine any photographic display used by the government during pre-trial identification procedure, to determine whether it improperly suggested his identity." *State v. Pratt*, 161 W.Va. 530, 544, 244 S.E.2d 227, 235 (1978). "A defendant must be allowed an *in camera* hearing on the admissibility of a pending in-court identification when he challenges it because the witness was a party to pre-trial identification procedures that were allegedly constitutionally infirm." *Id.* at syl. pt. 6. In this case, Miller identified the appellant by selecting him from a photo array. However, the appellant did not challenge either the composition of the array or the manner in which it

---

**3.** The appellant indicated otherwise at trial. Defense counsel complained to the court that Miller "never made a positive identification in

Court that day ... I raised the issue before the Court, and that was one of the purposes of the hearing...."

was presented to Miller. Such a challenge is a prerequisite to a defense demand for an *in camera* identification hearing.

 Finally, in his last assignment of error, the appellant contends that the trial court erred when it requested that a member of the Brooke County Sheriff's Department ask potential witnesses and trial spectators to step outside the courtroom to be scanned for weapons. The appellant argues that it was obvious to the jury that this was being done and that it indicated that the appellant was a threat and therefore guilty of the crime charged.

There is no support in the record for the contention that security precautions initiated by the court "created a prejudicial environment against the defendant in which to have his case tried." The appellant raised no objections to the procedures at trial, and has therefore waived any right to do so now. *See State v. Trogdon*, 168 W.Va. 204, 283 S.E.2d 849 (1981).

We find no reversible error in this case. Therefore, the December 31, 1991, final order of the Circuit Court of Brooke County is affirmed.

Affirmed.