499 S.E.2d 846

Gina K. ANDREWS, Administratrix of the Estate of Justin Kyle Andrews, Gina K. Andrews, Individually, and Jeffrey Andrews, Individually, Plaintiffs Below, Appellants,

v.

REYNOLDS MEMORIAL HOSPITAL, INC., a Corporation; and R.W. Spore, M.D., Defendants Below, Appellees.

No. 23858.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 9, 1997.

Decided Dec. 5, 1997.

Linda M. Bordas, James B. Stoneking, Bordas, Bordas & Jividen, Wheeling, for Appellants.

James F. Companion, John Porco, Patrick S. Casey, Schrader, Byrd, Companion & Gurley, Wheeling, for Appellees.

McHUGH, Justice:

This action concerns allegations of medical malpractice and is before this Court upon an appeal from the final order of the Circuit Court of Marshall County, West Virginia, entered on August 26, 1995. The appellants are Gina K. Andrews and her husband, Jeffrey Andrews. The appellees are Reynolds Memorial Hospital, Inc., and R.W. Spore, an emergency room physician. According to the appellants, the appellees negligently failed to diagnose and treat Gina K. Andrews' preterm labor, which negligence resulted in the death of the appellants' infant son, Justin Kyle Andrews. In addition, the appellants alleged that Reynolds Memorial Hospital acted negligently in hiring Dr. Spore and in retaining him upon the hospital staff. As reflected in the final order, following the entry of judgment for the appellants in the amount of $2,762,017, upon a jury verdict, the circuit court granted the motion of the appellees for a new trial. The appellants contend that the granting of a new trial constituted an abuse of discretion.

This Court has before it the petition for appeal, all matters of record and the briefs and argument of counsel. The circuit court granted a new trial because it concluded: (1) that the jury engaged in speculation in including in its verdict an amount for lost future earnings of Justin Kyle Andrews; (2) that the circuit court should not have exclud-

ed the evidence of the appellees that Gina K. Andrews underwent a prior elective abortion, which evidence, according to the appellees, predisposed her to problems concerning her pregnancy with Justin Kyle Andrews; and (3) that the circuit court should have granted the appellees' motion to bifurcate, for separate trial, the issue of whether Reynolds Memorial Hospital acted negligently in hiring and in retaining Dr. Spore. Upon review, however, and for the reasons stated below, this Court is of the opinion that none of those grounds warranted the granting of a new trial. Consequently, we reverse the final order and remand this action to the circuit court for reinstatement of the $2,762,017 judgment.

## I

At 2:18 a.m. on July 6, 1990, Gina K. Andrews and her husband, Jeffrey, reported to the emergency room at Reynolds Memorial Hospital. At that time, Gina was approximately six months pregnant and complained of vomiting, diarrhea, vaginal discharge and abdominal pain. Dr. R.W. Spore, the physician on duty in the emergency room, examined Gina and spoke with her obstetrician, Dr. Richard A. Simon, by telephone.[1] Concluding that Gina was suffering from vaginitis (an inflammation of the vagina), Dr. Spore prescribed an antibiotic and instructed Gina to follow up with Dr. Simon or return to the emergency room, if necessary. Gina was discharged from Reynolds Memorial Hospital at 4:35 a.m.

At home, Gina's symptoms continued with increasing pain, and, at approximately 6:45

a.m. on July 6, 1990, she and her husband returned to the emergency room. During this second appearance at the emergency room, Gina was not seen by Dr. Spore, whose shift ended at 7:00 a.m. Rather, Gina was taken to the obstetrics unit of the hospital for monitoring. As Gina indicated at trial, however, the baby began emerging before the arrival of a physician at her room. At 7:50 a.m., Justin Kyle Andrews was born, with Dr. John J. Templeton, the emergency room physician then on duty, arriving to complete the delivery process.[2]

As a result of complications, which included serious respiratory problems, Justin Kyle Andrews was transferred from Reynolds Memorial Hospital to West Virginia University Hospital in Morgantown, West Virginia. Justin, however, died at West Virginia University Hospital on July 7, 1990. The Report of Death completed by the attending physician indicated "cardiorespiratory failure, secondary to prematurity."

In July 1992, the appellants instituted this action. As stated above, the complaint alleged that Reynolds Memorial Hospital and Dr. R.W. Spore negligently failed to diagnose and treat Gina K. Andrews' preterm labor and that such negligence resulted in the death of the appellants' infant son, Justin Kyle Andrews. In addition, the complaint alleged that Reynolds Memorial Hospital acted negligently in hiring Dr. Spore and in retaining him upon the hospital staff.

Following a number of pretrial proceedings and the completion of discovery, the

1. Testimony elicited during the trial was conflicting with regard to the substance of the telephone conversation between Dr. Spore and Dr. Simon. Whereas Dr. Spore testified that he "passed on every bit of information" he could to Dr. Simon concerning Gina's condition, Dr. Simon indicated that, had he been made aware of all of the facts available to Dr. Spore on July 6, 1990, he would have, at least, had Gina monitored for preterm labor.

2. As Gina K. Andrews testified at trial:

A. ... I kept feeling the baby coming out. My husband wasn't with me. My doctor wasn't there. I had no idea what to do.

Q. Okay. And what was the next thing that happened?

A. A nurse came back in the room with another nurse.

Q. And what did they do or say?

A. One of the nurses started screaming I was crowning, and they both left the room again.

Q. Okay. So you were there alone again?

A. Yes.

Q. And are in—are you having a lot of really bad pain at that time?

A. Yes, I was having a lot of pain.

. . . .

Q. And what happened then?

A. The nurses came back and they told me not to push, and Dr. Templeton came up and he delivered the rest of my baby.

action went to trial in August 1994. At the beginning of the trial, following the selection of the jury and prior to the commencement of opening statements, the appellees pursued, for the first time, the possibility of bifurcating the allegations of the negligent hiring and retention of Dr. Spore from the remaining issues at trial concerning the death of Justin Kyle Andrews. The circuit court denied the appellees' motion to bifurcate, however, as untimely.[3]

During the trial, Dr. John F. Burke, an economist called as a witness by the appellants, testified with respect to the lost future earnings of Justin Kyle Andrews. In particular, based upon statistical factors, including an average life expectancy, an average work-life expectancy and, in addition, the educational background of Justin's parents,[4] Dr. Burke estimated Justin's lost future earnings with regard to three life scenarios, reduced to present value. As set forth by Dr. Burke, the lost future earnings were: (1) $1,607,268 to $1,795,397 based upon a four year college education; (2) $1,193,042 to $1,401,624 based upon a college education of one to three years; and (3) $875,342 to $1,041,000 based upon a high school education. The testimony of Dr. Burke was admitted to the jury over the objection of the appellees that the testimony was speculative.

Nevertheless, the evidence of the parties at trial primarily concerned the question of whether Dr. Spore's actions on July 6, 1990, deviated from the proper standard of care. The evidence of the appellants indicated that, based upon the symptoms presented by Gina K. Andrews that evening, and knowing that she was pregnant, Dr. Spore should have diagnosed preterm labor and (1) should have attempted to slow the labor process through medications, in order to increase Justin's chances of survival, or (2) should have transferred Gina from the emergency room to more specialized care. In that regard, the evidence of the appellants indicated that Gina had experienced an "uneventful" pregnancy up to the point of the preterm labor and that there was nothing to suggest any medical problems concerning the baby.[5]

On the other hand, the evidence of the appellees at trial indicated that, when Gina K. Andrews first arrived at the emergency room on July 6, 1990, she was suffering from chorioamnionitis (an infection in the lining of the uterus), which ultimately resulted in Gina's preterm labor and in the death of Justin Kyle Andrews. According to the evidence of the appellees, chorioamnionitis rendered the preterm labor and death unpreventable.[6] In response, however, the appellants elicited testimony to the effect that Gina K. Andrews did not have chorioamnion-

3. Indicating that bifurcation was a matter that "could have been considered early on," the circuit court stated that the appellees' motion to bifurcate was "too late."

4. As the petition for appeal filed in this Court stated, Gina K. Andrews was a licensed practical nurse with a one-year associate degree, and Jeffrey Andrews was the manager of a restaurant with three years of college studies.

5. During the trial, Dr. Simon, Gina K. Andrews' obstetrician, testified:
    Q. Now, I'd like to talk a little bit about the pregnancy that Gina had with Justin Kyle Andrews. Okay? Her son. Did she have a fairly uneventful course prior to July 1990?
    A. Yes, she did.
    Q. Now, she's indicated that she's had some minimal morning sickness due to the pregnancy. Would that be consistent with what you remember?
    A. Yes.
    Q. Anything else that she had that was significant?
    A. Not that I recall.

Moreover, Dr. Templeton, the emergency room physician who completed the delivery process, indicated that, although the birth of Justin Kyle Andrews was by breach delivery, Justin was "well formed" considering his prematurity. In addition, the appellants called other medical experts as witnesses who stated that the survival rate for babies such as Justin, born at approximately six months to 28 weeks gestation, was in excess of 75%.

6. It should be noted that the appellees sought the admission of evidence showing that Gina K. Andrews underwent a prior elective abortion "a few years before the birth at issue." According to the appellees, the abortion predisposed Gina to chorioamnionitis, which, in turn, resulted in problems concerning her pregnancy with Justin Kyle Andrews. The circuit court, however, excluded all references to the abortion on the ground that its probative value was outweighed by the danger of unfair prejudice. See W.Va. R.Civ.P. 403.

itis.[7]

Finally, with regard to the allegations of the negligent hiring and retention of Dr. Spore, the evidence of the appellants consisted of: (1) a 1989 agreed order between Dr. Spore and the Board of Medical Examiners of the State of Tennessee, placing Dr. Spore's license to practice medicine in that State upon probationary status, because Dr. Spore had written a large volume of prescriptions "not for a legitimate medical purpose and not in the course of professional practice," (2) testimony to the effect that Reynolds Memorial Hospital knew about the agreed order prior to hiring Dr. Spore but failed to investigate the circumstances thereof; and (3) testimony indicating that various complaints had been made to Reynolds Memorial Hospital that Dr. Spore was "unresponsive" to the needs of patients and staff members of that hospital.[8] In response, the appellees submitted evidence to the effect that Dr. Spore had complied with all of the terms of the Tennessee order and had not since engaged in the unwarranted writing of prescriptions. Furthermore, the appellees stated that Dr. Spore had treated thousands of patients at Reynolds Memorial Hospital without complaints having been made against him.

At the conclusion of the trial, the jury returned a verdict for the appellants in the amount of $2,762,017. As the verdict form indicates, that amount consisted of: (1) $12,-017 for medical and funeral expenses; (2) $1,750,000 for lost future earnings of Justin Kyle Andrews; and (3) $1,000,000 for sorrow and loss of companionship. The jury found Dr. Spore 95% negligent and Reynolds Memorial Hospital 5% negligent. The verdict was reduced to judgment by order entered on August 19, 1994.

As reflected in the final order of August 26, 1995, however, the circuit court granted the appellees' motion for a new trial. As stated above, the circuit court granted the motion because it concluded: (1) that the jury engaged in speculation in including in its verdict an amount for lost future earnings; (2) that the circuit court should not have excluded the evidence of the appellees that Gina K. Andrews underwent a prior elective abortion, see n. 6, supra; and (3) that the circuit court should have granted the appellees' motion to bifurcate, for separate trial, the issue of whether Reynolds Memorial Hospital acted negligently in hiring and in retaining Dr. Spore. The appellants, nevertheless, ask this Court to reinstate the $2,762,017 judgment.

II

Pursuant to Rule 59(a) of the West Virginia Rules of Civil Procedure, a new trial may be granted "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law." See generally Lugar & Silverstein, West Virginia Rules of Civil Procedure, p. 447–50 (Michie 1960); Vol. 11, Wright, Miller & Kane, Federal Practice and Procedure, p. 37–223 (West Pub. 1995).

■■■ In Tennant v. Marion Health Care Foundation, 194 W.Va. 97, 104, 459 S.E.2d 374, 381 (1995), this Court stated that "we review a circuit court's ruling on a motion for a new trial under an abuse of discretion standard." That statement in Tennant is derivative of syllabus point 3 of In re State Public Building Asbestos Litigation, 193 W.Va. 119, 454 S.E.2d 413 (1994), cert. denied, 515 U.S. 1160, 115 S.Ct. 2614, 132 L.Ed.2d 857 (1995), which holds:

> A motion for a new trial is governed by a different standard than a motion for a directed verdict. When a trial judge vacates a jury verdict and awards a new trial pursuant to Rule 59 of the West Virginia Rules of Civil Procedure, the trial judge has the authority to weigh the evidence and consider the credibility of the witnesses. If the trial judge finds the verdict

---

7. Dr. Cyril H. Wecht, an expert in pathology called as a witness by the appellants, testified that there was no evidence concerning Gina K. Andrews "of a clinically demonstrable, clinically manifested chorioamnionitis."

8. Edith White, for example, an emergency medical technician, indicated that Dr. Spore would not communicate with emergency medical personnel about patients brought into the emergency room by ambulance.

is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, the trial judge may set aside the verdict, even if supported by substantial evidence, and grant a new trial. A trial judge's decision to award a new trial is not subject to appellate review unless the trial judge abuses his or her discretion.

*See also* syl. pt. 1, *Witt v. Sleeth,* 198 W.Va. 398, 481 S.E.2d 189 (1996); syl. pt. 1, *Toothman v. Brescoach,* 195 W.Va. 409, 465 S.E.2d 866 (1995); *Coleman v. Sopher,* 194 W.Va. 90, 96, 459 S.E.2d 367, 373 (1995); *Maynard v. Adkins,* 193 W.Va. 456, 459, 457 S.E.2d 133, 136 (1995).

In language comparable to the above holding in *Asbestos Litigation,* this Court observed in syllabus point 4 of *Young v. Duffield,* 152 W.Va. 283, 162 S.E.2d 285 (1968), *overruled on other grounds in Tennant, supra,* that "[a]n appellate court is more disposed to affirm the action of a trial court in setting aside a verdict and granting a new trial than when such action results in a final judgment denying a new trial." Nevertheless, as this Court acknowledged in *Maynard, supra,* "consistent with *Asbestos Litigation,* on the other hand, is the general principle that the judgment of a trial court in awarding a new trial should be reversed ... if a consideration of the evidence shows that the case was a proper one for jury determination." 193 W.Va. at 459, 457 S.E.2d at 136. Accordingly, we also note syllabus point 4 of *Sanders v. Georgia–Pacific Corp.,* 159 W.Va. 621, 225 S.E.2d 218 (1976), which holds: "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." *See also* syl. pt. 2, *Witt, supra; Cline v. Joy Mfg. Co.,* 172 W.Va. 769, 774, 310 S.E.2d 835, 840–41 (1983).

### III

In this action, as stated above, the circuit court admitted the testimony of Dr. Burke, over the objection of the appellees, estimating Justin Kyle Andrews' lost future earnings, based upon three life scenarios, reduced to present value. The scenarios provided that Justin would have had an average life expectancy, an average work-life expectancy and either (1) four years of college, (2) one to three years of college or (3) at a minimum, a high school education. The educational background of Justin's parents was also considered. *See* n. 4, *supra.* The $1,750,000 awarded by the jury for lost future earnings was within the range of the estimated future earnings set forth by Dr. Burke (based upon a four year college education). Following the trial, however, the circuit court concluded that the award of lost future earnings was speculative and granted a new trial. As the circuit court determined: "[T]he child in the instant case died within a day after his premature birth, and there was no medical evaluation as to life expectancy or potential physical or mental capacity to produce an economic benefit to his dependents."

Contending that the circuit court ruled correctly, the appellees cite *Panagopoulous v. Martin,* 295 F.Supp. 220 (S.D.W.Va.1969). In *Panagopoulous,* a viable fetus was stillborn as the result of a motor vehicle accident, and the district court held that under West Virginia law an action could be maintained to recover damages for the child's death. However, the district court indicated that such damages should be limited to damages for "sorrow, distress and bereavement" and should not include economic loss, because of the "impossibility of knowing or being able to ascertain the child's potential capacity, physical and mental, to produce an economic benefit[.]" 295 F.Supp. at 227. According to the appellees, the reasoning of the district court in *Panagopoulous* supports the conclusion of the circuit court, in this action, that the award of lost future earnings was speculative.

We note in passing, however, that an analysis of the *Panagopoulous* opinion does not indicate that such economic damages are *never* recoverable. As the *Panagopoulous* opinion states: "[A]s a predicate for an award for loss of economic benefits for the wrongful death of an unborn child, the plaintiff must first produce evidence from which the jury could rationalize and determine with

reasonable accuracy *the probable quantum of such potential loss.*" 295 F.Supp. at 227 (emphasis added). In that regard, we further note that the *Panagopoulous* opinion made no reference to various "life scenarios" concerning the child, such as those described by Dr. Burke in this action.

The appellants, on the other hand, contend that the circuit court committed error in concluding that the award for lost future earnings was speculative. Relying upon this Court's decision in *Robinson v. Charleston Area Medical Center,* 186 W.Va. 720, 414 S.E.2d 877 (1991), the appellants assert that the range of such earnings, as related to Justin Kyle Andrews, was proven with "reasonable certainty" and that, therefore, the jury award of $1,750,000 for lost future earnings should not have been disturbed. *See Jordan v. Bero,* 158 W.Va. 28, 56, 210 S.E.2d 618, 636–37 (1974) (A child who has never been gainfully employed may recover damages for impairment of his future earning capacity, if "proved to a reasonable degree of certainty.")

The right to maintain an action for wrongful death in this State is provided by *W.Va. Code,* 55–7–5 [1931].[9] *See Dairyland Insurance Company v. Westfall,* 199 W.Va. 334, 336 n. 1, 484 S.E.2d 217, 219 n. 1 (1997). Moreover, *W.Va.Code,* 55–7–6(c)(1) [1989], concerning damages in wrongful death actions, states that "[t]he verdict of the jury shall include, but may not be limited to, ... compensation for reasonably expected loss of ... income of the decedent[.]"

Though not specifically considering a jury award for lost future earnings, this Court, in *Baldwin v. Butcher,* 155 W.Va. 431, 184 S.E.2d 428 (1971), stated, generally, that under this State's wrongful death statute (sections 5 and 6, article 7, chapter 55, of *The West Virginia Code*):

> an action may be maintained by the personal representative of a viable unborn child for the wrongful death of such child

caused by injuries sustained by it while in the womb of its mother resulting from the negligence of the defendant *and, upon sufficient proof, such damages as may be recoverable under the statute may be awarded in such action.*

155 W.Va. at 446–47, 184 S.E.2d at 436 (emphasis added).

In *Robinson, supra,* cited by the appellants, an infant suffered permanent and total brain damage as the result of alleged medical malpractice with regard to the mother's labor and the delivery of the child. The primary issue, in *Robinson,* concerned the constitutionality of *W.Va.Code,* 55–7B–8 [1986], which provided that the maximum amount recoverable as damages for *noneconomic* loss in such actions, i.e. loss associated with pain, suffering, mental anguish and grief, "shall not exceed one million dollars." This Court, in *Robinson,* upheld the constitutionality of *W.Va.Code,* 55–7B–8 [1986]. In so holding, this Court noted, however, that the jury's verdict included an award of $750,000 for lost future earnings concerning the infant. In holding that the award should not be disturbed, this Court, in *Robinson,* stated:

> With respect to the loss of future earnings, a Mr. Selby, a certified public accountant, estimated this type of economic damages to be incurred by Mark A. Robinson, II, over a normal life expectancy for a male child of his age. Mr. Selby's estimation of lost future earnings was based upon three 'average life' scenarios, reduced to present value: $152,809 for a minimumwage worker; $458,128 for a high school graduate; and $785,613 for a college graduate. The $750,000 awarded by the jury for this type of economic damage was within this range supported by the evidence.

186 W.Va. at 732, 414 S.E.2d at 889.

A review of relevant authorities in other states has afforded this Court little guidance upon the question of the propriety of an award of lost future earnings with regard to

9. As *W.Va.Code,* 55–7–5 [1931], provides in part:
> Whenever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action to recover

damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured[.]

a deceased infant. In fact, the few notable case decisions examined by this Court vary in their respective conclusions and are unique to specific circumstances. *See, e.g., Turfway Park Racing Association v. Griffin,* 834 S.W.2d 667 (Ky.1992) (parents of deceased child entitled to new trial on issue of damages for child's destroyed power to earn money); *DiDonato v. Wortman,* 320 N.C. 423, 358 S.E.2d 489 (1987) (damages for lost income of stillborn child not recoverable); *Bulala v. Boyd,* 239 Va. 218, 389 S.E.2d 670 (1990) (statistical averages were too remote from child's personal situation to permit intelligent estimate of loss of earning capacity); *Balmer v. Dilley,* 81 Wash.2d 367, 502 P.2d 456 (1972) (recovery of damages allowed for loss of future earnings during normal life expectancy of deceased minor). *See generally* M.L. Cross, Annotation, *Measure and Elements of Damages for Personal Injury Resulting in Death of Infant,* 14 A.L.R.2d 485 (1950).

Here, as observed above, the district court, in *Panagopoulous,* did not preclude an award for lost future earnings in actions such as this one, so long as the plaintiff produces evidence of "the probable quantum of such potential loss." That principle is consistent with the admonition found in *Jordan, supra,* that damages for the impairment of a child's future earning capacity must be "proved to a reasonable degree of certainty." Moreover, the principle thus expressed in *Panagopoulous* is consistent with *W.Va.Code,* 55–7–6(c)(1) [1989], which provides that recovery may be had for the "reasonably expected loss of . . . income of the decedent[.]"

In any event, the district court, in *Panagopoulous,* a case decided in 1969, did not have the benefit of the 1991 decision of this Court in *Robinson.* Clearly, the evidence of Dr. Burke in this action paralleled that of the certified public accountant in *Robinson,* which evidence this Court found sufficient, in *Robinson,* to sustain an award of lost future earnings. Here, moreover, additional factors are present. In this action, the record indicates that the educational background of the parents of Justin Kyle Andrews was taken into consideration by Dr. Burke in estimating the three life scenarios. *See* n. 4, *supra.* It

is uncertain whether such a factor was considered in *Robinson.* More important, however, this Court has before it more information than in *Robinson* concerning the medical status of the child prior to the alleged malpractice. In this action, the evidence at trial was in conflict as to whether Gina K. Andrews suffered from chorioamnionitis when she first arrived at the emergency room on July 6, 1990. From the standpoint of the appellants, however, she did not have chorioamnionitis. Furthermore, her pregnancy had been "uneventful" up to that point, and Justin appeared to be a "well formed" baby at the time of his birth. Moreover, according to the experts of the appellants, the survival rate for babies such as Justin, born at approximately six months to twenty-eight weeks gestation, was in excess of 75%. *See* n. 5, *supra.*

■ Consequently, a review of the circumstances and holding of *Robinson, supra,* warrant, *a fortiori,* a conclusion in this action that the question of lost future earnings was a proper matter for jury consideration. Accordingly, this Court holds that a jury award for the lost future earnings of an infant, in a negligence action alleging that the infant's death resulted from medical malpractice committed with regard to the mother's labor and delivery of the child, will not be set aside by this Court as speculative: (1) where the award of lost future earnings is within the range of estimated future earnings, based upon various life scenarios, reduced to present value, established by the expert testimony of an economist at trial and (2) where the economic and medical evidence of the plaintiff at trial indicates that the infant in question, though born prematurely, would statistically have had an average life expectancy and an average work life expectancy, but for the alleged medical malpractice.

Here, the evidence described above provided a sufficient foundation for the award of lost future earnings, and the $1,750,000 amount returned by the jury was within the range of earnings set forth by Dr. Burke. Consequently, the circuit court committed

error in concluding that the award was speculative and in granting a new trial.

## IV

[10] The circuit court also granted the appellees' motion for a new trial because it determined that the evidence of the appellees, that Gina K. Andrews underwent a prior elective abortion "a few years before the birth at issue," should not have been excluded. Initially, the circuit court was of the opinion that the probative value of that evidence was outweighed by the danger of unfair prejudice. Following the trial, however, the circuit court indicated that the evidence should have been admitted in order to allow the appellees to refute the testimony of Dr. Wecht, an expert in pathology called as a witness by the appellants, that Gina K. Andrews did not have chorioamnionitis. According to the appellees, the prior abortion predisposed Gina to chorioamnionitis, which infection she, in fact, had, and which resulted in problems concerning her pregnancy with Justin Kyle Andrews. *See* n. 6, *supra.*

■ According to Rule 402 of the *West Virginia Rules of Evidence,* generally, all relevant evidence is admissible at trial. However, as Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In particular, as this Court observed in syllabus point 4 of *Gable v. The Kroger Company,* 186 W.Va. 62, 410 S.E.2d 701 (1991): "Rules 402 and 403 of the *West Virginia Rules of Evidence* [1985] direct the trial judge to admit relevant evidence, but to exclude evidence whose probative value is substantially outweighed by the danger of unfair prejudice to the defendant." *See also* syl. pt. 10, *State v. George W. H.,* 190 W.Va. 558, 439 S.E.2d 423 (1993); syl. pt. 1, *State v. Dorisio,* 189 W.Va. 788, 434 S.E.2d 707

(1993); syl. pt. 4, *State ex rel. Tinsman v. Hott,* 188 W.Va. 349, 424 S.E.2d 584 (1992).

Here, Dr. Kurt Benirschke, a pathologist called as a witness by the appellees, testified extensively during the trial about the nature of chorioamnionitis and stated that Gina K. Andrews had chorioamnionitis when she went to the emergency room on July 6, 1990. He further described the various problems affecting an unborn baby, such as Justin Kyle Andrews, where a pregnant mother suffers from that infection. The testimony of Dr. Benirschke was in contrast to the testimony of Dr. Wecht, as indicated above, who stated that Gina had no evidence "of a clinically demonstrable, clinically manifested chorioamnionitis." *See* n. 7, *supra.*

Accordingly, the question of whether Gina K. Andrews had chorioamnionitis was a proper matter for jury consideration. Significantly, however, the evidence of record indicates that, rather than directly causing chorioamnionitis, the elective abortion, which took place some years before the pregnancy with Justin Kyle Andrews, may only have "predisposed" Gina to that infection. Therefore, upon a review of all of the circumstances herein, this Court is of the opinion that the circuit court acted correctly in initially excluding the evidence of the abortion upon the grounds of prejudicial impact. Indeed, the circuit court was equivocal in granting a new trial with regard to the abortion evidence, as reflected in the following comment the circuit court made in its final ruling: "When this case is retried the presiding judge may again weigh the above factors and make his or her own decision regarding this evidentiary issue."

■ Finally, the circuit court granted a new trial because it concluded that it should have granted the appellees' motion to bifurcate, for separate trial, the issue of whether Reynolds Memorial Hospital acted negligently in hiring and in retaining Dr. Spore.[10] In

---

**10.** This Court has previously indicated that a cause of action may be maintained for negligent hiring and retention. Syl. pt. 1, *King v. Lens Creek Limited Partnership,* 199 W.Va. 136, 483

S.E.2d 265 (1996); syl. pt. 8, *Thomson v. McGinnis,* 195 W.Va. 465, 465 S.E.2d 922 (1995); *Roberts v. Stevens Clinic Hospital,* 176 W.Va. 492, 498, 345 S.E.2d 791, 797 (1986).

particular, the circuit court concluded that the appellants' evidence upon the negligent hiring and retention issue, i.e., the 1989 agreed order of the Tennessee Board of Medical Examiners concerning the improper writing of prescriptions by Dr. Spore and the testimony of various witnesses that Dr. Spore had been unresponsive to the needs of patients and staff members of Reynolds Memorial Hospital, was prejudicial to the jury's consideration of whether Dr. Spore and Reynolds Memorial Hospital negligently failed to diagnose and treat Gina K. Andrews' preterm labor on July 6, 1990.

■■■ Rule 42(c) of the *West Virginia Rules of Civil Procedure* allows a circuit court to order the separate trial of issues upon a motion to bifurcate,[11] and, as this Court has previously stated, the granting of separate trials pursuant to that Rule rests, generally, within the discretion of the trial court. *See State ex rel. Cavender v. McCarty*, 198 W.Va. 226, 230, 479 S.E.2d 887, 891 (1996); *State ex rel. State Farm Fire & Casualty v. Madden*, 192 W.Va. 155, 160, 451 S.E.2d 721, 726 (1994); syl. pt. 3, *Berry v. Nationwide Mutual Fire Insurance Co.*, 181 W.Va. 168, 381 S.E.2d 367 (1989); *Bennett v. Warner*, 179 W.Va. 742, 748, 372 S.E.2d 920, 926 (1988). Indicating, however, that a circuit court's authority under Rule 42(c) "is not unlimited" and that bifurcation should be granted only when "clearly necessary," 179 W.Va. at 748, 372 S.E.2d at 926, this Court, in *Bennett, supra*, held in syllabus point 6:

Parties moving for separate trials of issues pursuant to West Virginia Rule of Civil Procedure 42(c), or the court if acting *sua sponte*, must provide sufficient justification to establish for review that informed discretion could have determined that the bifurcation would promote the recognized goals of judicial economy, convenience of the parties, and the avoidance of prejudice,

the overriding concern being the provision of a fair and impartial trial to all litigants.

*See also State ex rel. Appalachian Power Co. v. Ranson*, 190 W.Va. 429, 431 n. 4, 438 S.E.2d 609, 611 n. 4 (1993); syl. pt. 2, *Tinsman, supra*.

■■■ As stated above, the appellants instituted this action in July 1992, and the complaint specifically alleged that Reynolds Memorial Hospital acted negligently in hiring Dr. Spore and in retaining him upon the hospital staff. Nevertheless, the appellees raised the possibility of bifurcation for the first time in August 1994, at trial, following the selection of the jury and prior to the commencement of opening statements. The initial ruling of the circuit court was that the motion to bifurcate was untimely, as raising a matter that "could have been considered early on." *See* n. 3, *supra*.

In *West Virginia Insurance Company v. Lambert*, 193 W.Va. 681, 458 S.E.2d 774 (1995), an action went to trial involving the issues of (1) whether an insured acted negligently in conducting a refuse fire near the outbuilding of a neighbor and (2) whether the insured's insurance policy excluded coverage for damage to the outbuilding caused by the fire. In *Lambert*, this Court held that the circuit court acted within its discretion in denying the insurance company's motion to bifurcate the negligence and coverage issues. In particular, we observed, in *Lambert*, that the insurance company "should not have waited until the morning of trial to move for bifurcation of the coverage issue." 193 W.Va. at 685, 458 S.E.2d at 778. Rather, as this Court indicated, in *Lambert*, the insurance company should have been "more diligent" in protecting its interests. 193 W.Va. at 685, 458 S.E.2d at 778.

Here, not only did the appellees pursue, for the first time, the possibility of bifurcat-

11. As *W.Va.R.Civ.P.* 42(c) states:

The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third party claims, or issues, always preserving inviolate the right of trial by jury as declared by Article III, Section 13 of the West Virginia Constitution or as given by a statute of this State.

ing the negligent hiring and retention issue at the beginning of the trial (subsequent to jury selection), the circuit court, during the trial, gave limiting instructions to the jury concerning the negligent hiring and retention evidence. For example, as the circuit court stated to the jury:

> I caution you that in considering the question of negligence on the part of Dr. Spore, you cannot consider any of the evidence that has been presented regarding complaints and medical license proceedings. That evidence is not relevant at all to the manner of treatment by Dr. Spore of Gina Andrews on July 6, 1990. That evidence is relevant only to the issues of negligent hiring and/or retention, a claim only against the Reynolds Memorial Hospital, not Dr. Spore.

Accordingly, this Court is of the opinion that the circuit court acted within its discretion in its initial refusal to grant the motion of the appellees to bifurcate the allegations of the negligent hiring and retention of Dr. Spore from the remaining issues at trial.

Thus, the circuit court committed error in later granting a new trial upon that basis. *See Cavender*, 198 W.Va. at 233, 479 S.E.2d at 894 (Cleckley, J., concurring) ("American courts have always expressed a preference for unitary trials[.]")

 Upon all of the above, therefore, this Court is of the opinion that none of the grounds discussed above warranted the granting of the appellees' motion for a new trial. Accordingly, the final order of the Circuit Court of Marshall County, entered on August 26, 1995, is reversed, and this action is remanded to that court for reinstatement of the $2,762,017 judgment.[12]

Reversed and remanded.

MAYNARD, J., dissents and reserves the right to file a dissenting opinion.*

---

**12.** It should be noted that the appellees assert before this Court that the circuit court should have directed a verdict for Reynolds Memorial Hospital upon the negligent hiring and retention issue because the appellants, at trial, did not produce expert testimony upon that issue as required by *W.Va.Code*, 55–7B–7 [1986], of the West Virginia Medical Professional Liability Act, *W.Va.Code*, 55–7B–1 [1986], *et seq.*

The requirement of expert testimony under that statute, however, is not mandatory in all cases. As *W.Va.Code*, 55–7B–7 [1986], provides, in part: "The applicable standard of care and a defendant's failure to meet said standard, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses *if required by the court.*" (emphasis added). *See* syl. pt. 8, *McGraw v. St. Joseph's Hospital*, 200 W.Va. 114, 488 S.E.2d 389 (1997) ("A trial court is vested with discretion under W.Va. Code, 55–7B–7 (1986) to require expert testimony in medical professional liability cases, and absent an abuse of that discretion, a trial court's decision will not be disturbed on appeal.").

Here, the lack of expert testimony notwithstanding, a significant portion of the appellants' claim of negligent hiring and retention consisted of evidence submitted at trial of (1) an *agreed order* between Dr. Spore and the Tennessee Board of Medical Examiners placing Dr. Spore's license to practice medicine in that State upon probationary status and (2) testimony to the effect that Reynolds Memorial Hospital knew about the agreed order prior to hiring Dr. Spore but failed to investigate the circumstances thereof. *See*, T.J. Hurney, Jr., *Hospital Liability in West Virginia*, 95 W.Va.L.Rev. 943 (1993) (collecting cases) ("Hospitals have been held liable when the failure to properly scrutinize a physician's application results in unreasonable risk of harm to its patients."). Upon review, this Court concludes that, under the circumstances of this action, the evidence of the appellants upon the negligent hiring and retention issue was sufficient for the jury's consideration. Thus, the appellees' assertion concerning a directed verdict is without merit. *See also Roberts*, 176 W.Va. at 498, 345 S.E.2d at 797.

* [Editor's Note: Justice Maynard's opinion will be published in a later volume upon issuance.]