IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2023 Term

_____

No. 21-0764
_____

FILED

**April 28, 2023**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below,
Respondent,

v.

AARON GLENN HOARD,
Defendant Below,
Petitioner.

_____

Appeal from the Circuit Court of Preston County
The Honorable Steven L. Shaffer, Judge
Criminal Case Number: 20-F-92

AFFIRMED
_____

Submitted: February 8, 2023
Filed: April 28, 2023

William David Wilmoth, Esquire
Steptoe & Johnson PLLC
Wheeling, West Virginia


Christopher S. Etheredge, Esquire
Steptoe & Johnson PLLC
Charleston, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esquire
Attorney General
Lara K. Bissett, Esquire
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent

JUSTICE ARMSTEAD delivered the Opinion of the Court.

JUSTICE WOOTON concurs and reserves the right to file a concurring opinion.

JUSTICE BUNN, deeming herself disqualified, did not participate in the decision of this case.

JUDGE PAUL T. FARRELL, sitting by temporary assignment.

SYLLABUS BY THE COURT

1.      "'"Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.' Syl. [P]t. 4, *Sanders v. Georgia-Pacific Corp.*, 159 W. Va. 621, 225 S.E.2d 218 (1976)." Syl. Pt. 1, *Andrews v. Reynolds Mem'l Hosp., Inc.*, 201 W. Va. 624, 499 S.E.2d 846 (1997)." Syllabus Point 1, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

2.      "As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo*." Syllabus Point 1, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d 257 (1996).

3.      "Whether facts are sufficient to justify the delivery of a particular instruction is reviewed by this Court under an abuse of discretion standard. In criminal cases where a conviction results, the evidence and any reasonable inferences are considered in the light most favorable to the prosecution." Syllabus Point 12, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

4.      "Whether a change of venue is warranted rests in the sound discretion of the trial court, and its ruling thereon will not be disturbed, unless it clearly appears that such discretion has been abused." Syllabus Point 2, *State v. Gangwer*, 169 W. Va. 177, 286 S.E.2d 389 (1982).

5. "The remedial doctrines of knowing and intelligent waiver and harmless error are firmly established by statute, court rule and decisions as salutary aspects of the criminal law of this State." Syllabus Point 4, *State v. Blair*, 158 W. Va. 647, 214 S.E.2d 330 (1975).

6. "Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syllabus Point 5, *State v. Blair*, 158 W. Va. 647, 214 S.E.2d 330 (1975).

7. "The trial court must instruct the jury on all essential elements of the offenses charged, and the failure of the trial court to instruct the jury on the essential elements deprives the accused of his fundamental right to a fair trial, and constitutes reversible error." Syllabus, *State v. Miller*, 184 W. Va. 367, 400 S.E.2d 611 (1990).

8. "It is not error to refuse to give an instruction to the jury, though it states a correct and applicable principle of law, if the principle stated in the instruction refused is adequately covered by another instruction or other instructions given." Syllabus Point 3, *Morgan v. Price*, 151 W. Va. 158, 150 S.E.2d 897 (1966).

9. "'"To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.' [Syllabus] Point 2, Syllabus, *State v. Wooldridge*, 129 W. Va. 448, 40

S.E.2d 899 (1946)." Syllabus Point 1, *State v. Sette*, 161 W. Va. 384, 242 S.E.2d 464 (1978)." Syllabus Point 1, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

10.    """A present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial, is good cause for removing the case to another county.' [Syllabus Point 2], *State v. Dandy*, 151 W.Va. 547, 153 S.E.2d 507 (1967), *quoting* [Syllabus Point 1], *State v. Siers*, 103 W.Va. 30, 136 S.E. 503 (1927)." Syllabus Point 2, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978)." Syllabus Point 2, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

11.    "One of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant." Syllabus Point 3, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

12.    "Where the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error." Syllabus Point 5, *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972).

Armstead, Justice:

On November 3, 2019, Aaron Glenn Hoard ("Hoard") fired multiple gun shots, four of which struck and killed Grant William Felton, Jr. ("Grant"). As a result, Hoard was convicted by a Preston County jury of second-degree murder and was sentenced to a determinate term of 40 years. Following trial, the circuit court denied Hoard's motion for a new trial or, in the alternative, motion for judgment of acquittal and he appeals the circuit court's denial of that motion, raising four issues. First, he alleges that the State improperly referenced his right to pre-trial silence at two points during his trial. Second, he argues that the jury instructions were insufficient, unsupported, and incorrect. Third, he avers that he was denied a fair trial because of errors made regarding empanelment of the jury. Finally, Hoard asserts that because of cumulative errors during his trial, he was denied his right to a fair trial.

Having diligently reviewed the entire voluminous record on appeal, the briefs and arguments of the parties, all other matters of record, and the applicable legal authority, we find that the circuit court did not err and affirm the circuit court.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In the early evening of November 2, 2019, Hoard, his girlfriend, Machaela Jefferies ("Jefferies"), and his friend, Nathan Lanham ("Lanham"), left Hoard's home outside of Morgantown, West Virginia to meet at Brian Teets' ("Teets"), and his girlfriend,

1

Kristina Andrews' ("Andrews"), home on the Brandonville Pike a few miles outside of Terra Alta, West Virginia.[1] The Hoard Group then went to Shorthorns Saloon ("Shorthorns") in Terra Alta.

When the Hoard Group arrived at Shorthorns, it was full of patrons and the Hoard Group positioned itself in one of the few remaining spaces inside of Shorthorns – in front of the stage. As the evening progressed, Hoard became more and more rowdy and unwieldy, knocking into patrons on the dance floor and colliding with Sharon Roy, a patron seated on a bar stool, with such force that she fell to the floor. Not long after, Grant approached Hoard and asked him to calm down or leave. Shiloh Robertson ("Robertson"), Shorthorns' bouncer, observed the Hoard Group and Hoard's behavior and also saw Grant approach Hoard. Robertson noted that Hoard appeared angry after his conversation with Grant. Following Grant's discussion with Hoard, Shorthorns' owner Jason Peaslee ("Peaslee"), signaled Robertson to remove Hoard from Shorthorns.

By that time, it was the early morning hours of November 3, 2019. Robertson approached Hoard and told him he needed to leave. Robertson placed his hands under Hoard's arms and started to physically escort him from Shorthorns. At about the same time someone struck Robertson in the back of the head. Robertson continued to escort the Hoard Group outside of Shorthorns and ten to twelve people followed along with the

---

[1] These five people, Hoard, Jefferies, Lanham, Teets, and Andrews will be referred to collectively as the "Hoard Group."

remainder of the Hoard Group. Once outside, the Hoard Group began walking toward Hoard's truck, which was parked in a parking area adjacent to Shorthorns and the railroad tracks. After the Hoard Group left Shorthorns, the ten to twelve people continued to mingle outside Shorthorns' entrance.

Once inside Hoard's truck, the Hoard Group began recounting the events that had just transpired. At that time, Teets realized he was missing his hat and vest and Andrews determined that she did not have her phone, both having left those items inside Shorthorns. Andrews then asked Jefferies – who was driving the truck – to pull to the front of Shorthorns so they could retrieve these items. Thus, Jefferies parked Hoard's truck in the road across the street from Shorthorns and Hoard and Teets exited the truck and walked toward Shorthorns and the people still outside.

Hoard and Teets were immediately met by the people gathered outside of Shorthorns and others who came from inside as word quickly spread that they had returned and were trying to get inside Shorthorns. As the crowd focused its attention on Teets, Hoard walked across the street, away from the people and away from Shorthorns. However, after a brief period of time, Hoard walked back across the street and attempted to enter Shorthorns. He was met by Grant and Peaslee. Grant again told Hoard he needed to leave. Hoard retorted that he would "take you all on" or "take you all out." As a result of this statement, Grant grabbed Hoard by the shoulders and physically moved Hoard

3

across the street toward his truck. Grant and Hoard were followed by D.J. Wilt ("Wilt")

and Mike Felton ("Felton"), who were escorting Teets toward Hoard's truck.

Hoard suddenly broke away from Grant who then followed Hoard to the

passenger side of his truck. Hoard opened the passenger side door and Jefferies dove out

of the truck on top of Grant. Grant was knocked to the ground. Hoard then reached into

the passenger floorboard of his truck, where his briefcase was located. Inside his briefcase

was a gun, which Hoard retrieved, climbed on the running board, and fired four shots into

the air. Immediately after those four shots were fired, Grant, Wilt, and Felton attempted to

disarm Hoard. Felton testified that he tried to push Hoard's arm upward but Hoard lowered

the gun and fired four shots into Grant, mortally wounding him.[2] Wilt then wrested the

gun from Hoard, Jefferies climbed back into the driver's seat of the truck, and Hoard and

Jefferies fled the scene, with Jefferies driving the truck to Teets' home. As they fled, they

---

[2] Dr. Elizabeth Rouse from the Office of the Chief Medical Examiner testified that she observed four gunshot wounds to Grant. She was unable to determine the order the wounds were inflicted.

The first observed wound, described as "incapacitating and lethal" stuck Grant in the back of his head, slightly to the left of center. This bullet travelled in a downward direction through Grant's brain, exiting below the mandible on the right side of his neck. The second observed wound was to the front right side of Grant's chest. This bullet also travelled downward and slightly left to right, exiting through his back. The third observed wound was a superficial wound to Grant's upper right arm. The fourth and final observed wound was another superficial, grazing, wound to Grant's head. The fourth wound was the only wound of the four where soot and stippling were present around the wound. Dr. Rouse opined that this meant the fourth observed wound came from a gunshot fired at "intermediate to close range." The testimony is unclear as the precise location of the fourth wound.

left behind over half of the Hoard Group – Lanham, Teets, and Andrews, who had exited the truck.

Lieutenant Rodeheaver ("Rodeheaver") of the Preston County Sheriff's Department arrived on scene and took over as lead investigator. He received information that Hoard was the shooter and issued a BOLO[3] for him. He also sought assistance from the West Virginia State Police crime response team, who, led by Trooper Hall, assisted in gathering crime scene evidence. To ascertain the status of Grant, Rodeheaver left the scene and went to Preston Memorial Hospital in Kingwood where he was informed that Grant had succumbed to his wounds. Thereafter, Rodeheaver obtained an arrest warrant for Hoard, charging him with the first-degree murder of Grant.

Because Hoard lived outside of Preston County, contact was made with the Monongalia County Sheriff's Department on November 3, 2019, to conduct surveillance of Hoard's home and attempts were made to "ping" both Hoard and Jefferies' phones to ascertain their location but both phones were turned off. Additionally, both Hoard and Jefferies discontinued their Facebook accounts. Eventually, on November 4, 2019, Hoard turned himself in to the Monongalia County Sheriff's Department. At some point prior to his arrest, Hoard removed the distinctive truck topper from his truck.

---

[3] BOLO is a law enforcement acronym for "Be On the Look Out."

Hoard was indicted by a Preston County Grand Jury on one count of first-degree murder on June 23, 2020, and the matter was set for trial. Prior to trial, Hoard moved for a change of venue, or in the alternative, to conduct a telephone survey to determine the "climate" in Preston County surrounding the upcoming trial. The proffered purpose of the survey request was to conduct a random telephonic survey of 300 Preston County residents in hopes of gathering support for a motion for a change of venue. In support of this motion, Hoard attached a memorandum prepared by his consultant, Orion Strategies, that described the social media interactions regarding the murder that it had found during its research. The circuit court held the motion for change of venue in abeyance until after jury selection and denied the motion for the survey.[4]

Jury selection began on Wednesday, May 5, 2021. For jury selection, the circuit court summonsed ninety-eight potential jurors. Of the jurors who appeared for jury selection, seventy indicated during preliminary questioning that they had heard about the case prior to appearing for service. Therefore, every juror was subjected to individual *voir dire*. At the conclusion of individual *voir dire* of each prospective juror, each party raised any request it had to strike that prospective juror for cause. Of the first thirty-six jurors pulled from the jury wheel, from whom the jury was ultimately selected, Hoard moved to strike prospective jurors 5, 6, 12, 14, and 32 for cause and the circuit court granted those

---

[4] Hoard alleged he did not need court approval for the survey and the State did not object to one being performed.

6

motions.  The State moved to strike prospective jurors 22 and 27 for cause and the circuit

court also granted those motions.  Additionally, the circuit court struck prospective jurors

4, 11, 18, 25, 26, 28, 29, and 35 on its own.  Although disputed by Hoard, the record reflects

that no motions were made by either party to strike jurors 1, 21, 24, or 34 for cause.[5]

After jury selection was completed, the trial began on Friday, May 7, 2021.

During its opening statement, the State said the following:

> Lieutenant Rodeheaver did a considerable number of
> interviews along with other law enforcement officers with the
> sherrif's department to determine what happened on November
> 3[rd] of 2019, and the witnesses interviewed will be able to
> describe it to you in their own words.  The one interview we
> didn't get was with Aaron Hoard or his girlfriend.

This drew an immediate objection from Hoard's counsel and a motion for a mistrial was

made.[6]  The circuit court denied the motion, reasoning that the State "did not say that

---

[5] Hoard's brief represents that motions were made to strike each of these jurors for cause.  Our intensive review of the record indicates no such motions were made.

[6] The discussion on the record between Hoard's counsel, Belinda Haynie, Assistant Prosecuting Attorney Megan Fields, and the circuit court was as follows:

> Ms. Haynie: I'm going to move for a mistrial.  She can't talk
> about the fact that he didn't interview Aaron Hoard.
>
> Ms. Fields:  Yes, I can.
>
> Ms. Haynie: No, you can't.
>
> Ms. Fields:  Yes, I can.

(continued . . .)

7

[Hoard] did not give a statement.  She said [Lt. Rodeheaver] was unable to interview [Hoard]."

---

Ms. Haynie: You cannot comment on the defendant's—

Ms. Fields: Yes, I can.  He wasn't – he wasn't interviewed.

THE COURT:  Ms. Fields, calm down.  Calm down.  Okay.  Go ahead, Ms. Haynie.

Ms. Haynie:  Well, she cannot comment on the defendant's right to stay – remain silent and she just did with the jury.  I move for a mistrial.

THE COURT:  No, she did not say that he did not give a statement.  She said he was unable to interview Mr. Hoard.

Ms. Haynie:  That's a comment on his right to remain silent.

Ms. Fields: No, he has a right to remain silent at trial.

Ms. Haynie: No.

Ms. Fields: And to not testify.

Ms. Haynie: You cannot talk about his refusal to talk.

THE COURT:  Well, I'm going to note – I'm going to note your objection.  I'm going to overrule it right now.

Ms. Haynie: I'm moving for a mistrial.

THE COURT: Okay.  You can do that.

Ms. Haynie: Okay.

THE COURT: All right.

8

On Friday, May 14, 2021, the sixth day of trial, Hoard elected to testify. This subjected him to cross-examination by the State. During that cross-examination, the following exchange occurred:

> Q: So just so happened to be that the person that took you across the road that you say did a choke-out on your or choked you out –
>
> A: Yes, ma'am.
>
> Q: - was the only one that took these four bullets.
>
> A: Yes, ma'am.
>
> Q: And that was an accident?
>
> A: It was a complete and total accident. I never murdered that man.
>
> Q: You didn't murder him?
>
> A: I didn't murder that man.
>
> Q: But you never told police that, did you?

Hoard's counsel contemporaneously objected, approached the bench, and again moved for a mistrial on the grounds that the question was impermissible as it referenced Hoard's invocation of his Fifth Amendment privilege against self-incrimination, and "even if he testifies, it can't be used against him." The circuit court denied the motion stating that Hoard needed to state that he didn't give any statement to police upon the advice of counsel. However, after the bench conference, Hoard did not answer the question and no party asked that Hoard be compelled to do so.

Immediately after the parties rested, late in the day on Friday afternoon, May 14, 2021, the circuit court excused the jury for the day and began discussion of jury instructions. There were numerous jury instructions tendered by both parties. The State objected to several of Hoard's proposed jury instructions and Hoard objected to the State's proposed jury instruction on heat of passion, arguing this case did not involve heat of passion. Hoard tendered numerous instructions to the circuit court on the issue of self-

defense.[7] Ultimately, the circuit court gave a slightly modified version of Hoard's proposed instruction 31.[8]

---

[7] Hoard's proposed self-defense instructions 22, 23, 24, and 25 are reproduced here. Proposed instruction 22 provided:

The Court instructs the jury that it is not essential to the right of self-defense that the danger should in fact exist. If, to the defendant, it reasonably appeared that the danger in fact existed, he had the right to defend against it to the same extent and under the same rules that would apply in case the danger had been real.

In passing upon the danger, if any, to which the accused was exposed, you will consider the circumstances as they reasonably appeared to him and draw such conclusions from these circumstances as he could reasonably have drawn, situated as he was at the time. In other words, the Court instructs you that the accused is entitled to be tried and judged by the facts as they reasonably appeared to him and not by any intention that may or may not have existed in the mind of the deceased.

Proposed instruction 23:

The Court instructs the jury that as to the imminency of the danger which threatened the defendant, and the necessity of action in the first instant, the defendant is the judge; and that the jury must pass upon the defendant's action in the circumstances presented, viewing said action from the defendant's standpoint at the time of his action; and if the jury believe from all the facts and circumstances in the case, viewed from the standpoint of the defendant at the time of the action, that the defendant had reasonable ground to believe, and did believe, the danger imminent, and that the action was necessary to preserve his own life, or to protect him from great bodily harm, he was excusable for using a deadly weapon in his defense and the jury should find the defendant not guilty.

(continued . . .)

11

Proposed instruction 24:

> The Court instructs the jury that where a man is threatened with danger, the law authorizes him to determine from appearances and the actual state of things surrounding him as to the necessity of resorting to force, and if he acts from reasonable and honest conviction, he will not be held criminally responsible for a mistake as to the actual danger. Where other and more judicious men would have been mistaken: for when one man attempts to injure another, it gives the injured the right to make use of such means to prevent injury as his behavior and the situation necessitates.

Proposed instruction 25:

> The Court instructs the jury that a person has a right to repel force by force in the defense of his person, his family or his habitation, and if in so doing he may use only so much force as the necessity, or apparent necessity, of the case requires, he is not guilty of any offense, though he kills or injures his assailant in so doing.

[8] The only changes made by the circuit court to Hoard's proposed instruction 31 were grammatical. The version given by the Court stated:

> Thus, one of the questions to be determined by you in this case is whether or not [Hoard] acted in self-defense as to justify his acts. A person can claim self-defense for the protection of [themselves] or others. Under the laws of this state, if the defendant was not the aggressor, and had reasonable grounds to believe and actually did believe that he was in immediate danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant, then he had the right to employ deadly force to defend himself. Deadly force is considered force which is likely to cause death or serious bodily harm.
>
> In order for [Hoard] to have been justified in the use of deadly force in self-defense, he must not have provoked the

(continued . . .)

12

Over the intervening weekend, Hoard's counsel sent an email to the circuit court that raised that the instruction on malice was being given twice to the jury – once during the instruction for first-degree murder and once during the instruction for second-degree murder. That email is not in the record and no specific objection was lodged on the record to the circuit court for reading the malice instruction twice. Once the entire body of instructions was compiled, Hoard only interjected a general objection to the circuit court not giving all of his offered instructions:

> And, Your Honor, just so I'm making a record for appeal, I just want to say that I'm – any instruction or verdict form that I previously submitted that's not given, I would preserve that objection, and I don't know specifically what they are right now, but, I mean, I think generally the [c]ourt has given, you know, sort of the instructions – I mean, honestly, right now I can't think of anything. I mean, I know that I gave some self-defense instructions that probably, like, came from,

---

> assault on him or been the aggressor. Mere words, without more, do not constitute provocation or aggression.
>
> The circumstances under which he acted must have been such as to produce in the mind of a reasonable prudent person, similarly situated, the reasonable belief that the other person was then about to kill him or to do him serious bodily harm. In addition, [Hoard] must have actually believed that he was in imminent danger of death or serious bodily harm and that deadly force must be used to repel it.
>
> If evidence of self-defense is present, the State must prove beyond a reasonable doubt that [Hoard] did not act in self-defense. If you find that the State has failed to prove beyond a reasonable doubt that [Hoard] did not act in self-defense, you must find [Hoard] not guilty. In other words, if you have a reasonable doubt as to whether or not [Hoard] acted in self-defense, your verdict must be not guilty.

13

like, the 1930s the way they were written. So I just want to preserve that for appeal in case.

At the conclusion of the trial on Monday, May 17, 2021, Hoard was found guilty of second-degree murder. By order entered August 23, 2021, the circuit court denied Hoard's motion for judgment of acquittal and motion for new trial. Thereafter, Hoard was sentenced to a determinate term of forty years of incarceration. Hoard appeals from those orders.

## II. STANDARD OF REVIEW

This matter raises issues arising from rulings made at different points in a criminal trial and all of which were ruled upon in the circuit court's denial of the motion for judgment of acquittal and for a new trial and Hoard's sentencing. Motions for a new trial are governed by an abuse of discretion standard:

> "'Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.' Syl. [P]t. 4, *Sanders v. Georgia-Pacific Corp.*, 159 W. Va. 621, 225 S.E.2d 218 (1976)." Syl. Pt. 1, *Andrews v. Reynolds Mem 'l Hosp., Inc.*, 201 W. Va. 624, 499 S.E.2d 846 (1997).

Syl. Pt. 1, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

Sentencing orders are reviewed "under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands." Syl. Pt. 2, in

14

part, *State v. Georgius*, 225 W. Va. 716, 696 S.E.2d 18 (2010) (citation omitted).  Similarly, a circuit court's "decision to grant or deny a motion for mistrial is reviewed under an abuse of discretion standard."  *State v. Lowery*, 222 W. Va. 284, 288, 644 S.E.2d 169, 173 (2008).

Issues arising from jury instructions have a two-part review.  "As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo*."  Syl. Pt. 1, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d 257 (1996).  "Whether facts are sufficient to justify the delivery of a particular instruction is reviewed by this Court under an abuse of discretion standard. In criminal cases where a conviction results, the evidence and any reasonable inferences are considered in the light most favorable to the prosecution."  Syl. Pt. 12, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

Finally, a change of venue is also reviewed under an abuse of discretion standard.  "Whether a change of venue is warranted rests in the sound discretion of the trial court, and its ruling thereon will not be disturbed, unless it clearly appears that such discretion has been abused."  Syl. Pt. 2, *State v. Gangwer*, 169 W. Va. 177, 286 S.E.2d 389 (1982).  Mindful of our standards of review, we now discuss the four issues raised by Hoard in this appeal.

## III. ANALYSIS

*A.     References to Pre-Trial Silence*

Hoard argues that the circuit court erred in not granting a mistrial because of the two instances in which the State made references to his pre-trial silence. The State argues there was no error but if there was, such error was harmless. The right to silence is protected by the Fifth Amendment of the United States Constitution which provides, in pertinent part, "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend V. The United States Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 471 (1966), this right requires "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation . . . ."

Later cases have extended *Miranda* to references made by the State to a criminal defendant's pre-trial silence during the course of a trial. In *Doyle v. Ohio*, 426 U.S. 610 (1976), the United States Supreme Court held that a defendant could not be impeached at trial based upon invocation of such defendant's pre-trial constitutional right to remain silent. "We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id*. at 619 (footnote omitted). This Court embraced the *Doyle* rule:

16

> Under the Due Process Clause of the West Virginia Constitution, Article III, Section 10, and the presumption of innocence embodied therein, and Article III, Section 5, relating to the right against self-incrimination, it is reversible error for the prosecutor to cross-examine a defendant in regard to his pre-trial silence or to comment on the same to the jury.

Syl. Pt. 1, *State v. Boyd*, 160 W. Va. 234, 233 S.E.2d 710 (1977). However, following *Doyle*, the United States Supreme Court modified *Doyle's* holding, finding, "that impeachment by use of prearrest silence does not violate the Fourteenth Amendment." *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980). We have followed *Jenkins* and have held there is no constitutional violation when "the defendant's silence occurred prior to his arrest and the giving of *Miranda* warnings . . . ." *State v. Ramsey*, 209 W. Va. 248, 256, 545 S.E.2d 853, 861 (2000). *See also State v. Walker*, 207 W. Va. 415, 419 n.2, 533 S.E.2d 48, 52 n.2 (2000) ("We point out that the protections afforded a defendant for post-*Miranda* silence are generally not available for pre-arrest silence. This Court noted approvingly in [*State v.*] *Oxier*, 175 W. Va. [760,] 761 n.1, 338 S.E.2d [360,] 361 n.1 [(1985)], language from the decision in *Jenkins*, that 'impeachment by use of prearrest silence does not violate the Fourteenth Amendment.'" (citation omitted)).

Our review of the record before us demonstrates that it is unclear whether the references made to Hoard's silence were to those of pre-arrest silence or post-*Miranda* silence. In light of that ambiguity, we are unable to conclusively find that such references are to Hoard's pre-arrest silence. Accordingly, the circuit court's determination that such

17

references did not violate Hoard's right against self-incrimination was erroneous. However, in light of the brevity of such references, coupled with the overwhelming evidence adduced against Hoard, we agree with the State that such error was harmless.[9]

Hoard urges us to apply *State v. Walker*, 207 W. Va. 415, 533 S.E.2d 48 (2000), and reverse and remand this matter for a new trial. In *Walker*, the following colloquy was elicited on cross-examination of the defendant:

> Q. Then, of course, you were at the hospital and Detective Westfall, who was investigating the shooting, came to see you, didn't he?
>
> A. Yes, him and Tommy Ransom.
>
> Q. And you didn't tell him a day afterwards that Mr. Belcher had pulled a knife on you, did you?
>
> A. It was two days. No, I couldn't talk to him.
>
> ....
>
> Q. You recall Detective Westfall testifying that you told him that this was all an accident, don't you?
>
> A. Right.
>
> Q. You didn't tell him that Harold Belcher threatened to gut you like a hog, did you?
>
> A. No.
>
> Q. You didn't show Detective Westfall the cut, did you?

---

[9] As argued by the State, *Doyle* acknowledged the possible application of harmless error analysis to a claim that a Defendant's post-Miranda silence was improperly referenced during a trial but did not apply such analysis because no argument was raised to apply that doctrine. *See Doyle*, 426 U.S. at 619-20.

A. No, I didn't. I meant to do that for a reason.

*State v. Walker*, 207 W. Va. 415, 420, 533 S.E.2d 48, 53 (2000). This Court held that line of questioning of Walker on his post-*Miranda* silence was reversible error. Further, in *Walker*, the State made the following statement in closing argument:

> He never said anything to the police officers that he was cut by Harold Belcher. He never said anything to the police officers that Harold Belcher had a knife to his groin. He never said anything to the police officers that Harold Belcher threatened to gut him like a hog. He never said that stuff because it didn't happen[ ].
>
> … Why wouldn't he tell—why wouldn't he tell the police officers that Harold Belcher did these things? It doesn't make sense. If it happened, he would have told them. He would have said that to the police officers.

*Id*., 207 W. Va. at 421, 533 S.E.2d at 54. This Court held that argument to be a violation of post-*Miranda* silence stating that "[t]o permit the State to do what occurred in this case, would effectively make *Miranda* warnings meaningless." *Id*.

However, we find the holding in *Walker* unpersuasive under the facts present here. We had previously indicated application of a harmless error analysis is appropriate in this same context. In *State v. Marple*, 197 W. Va. 47, 475 S.E.2d 47 (1996), we were confronted with a situation in which a witness commented on a defendant's silence during the trial:

> The first witness called by the State was Officer Cecil. Officer Cecil was the only witness to comment on the defendant's post-*Miranda* silence. The State did not dwell on the issue beyond the one question to Officer Cecil nor did Officer Cecil go beyond the few remarks quoted above.

*Id.*, 197 W. Va. at 53, 475 S.E.2d at 53. Balancing that limited comment regarding the defendant's silence with overwhelming evidence of guilt, we concluded, "we do not find a miscarriage of justice nor do we believe the circuit court's error brings into question the fairness, integrity, or reputation of judicial proceedings, and we decline the invitation to grant the defendant a new trial." *Id.*, 197 W. Va. at 54, 475 S.E.2d at 54.

More recently, in *Buxton v. Ballard*, No. 14-0648, 2015 WL 2364510 (W. Va. May 15, 2015) (memorandum decision), this Court examined a nearly identical set of questions to those posited in this matter. Buxton was asked on cross-examination:

> Q. [Prosecutor]: You stated to the jurors a while ago that you just wanted them to know your side of the story. The Story that you testified to, that you have in your notes, the way you answered your lawyer, have you ever told that story to anyone else other than your lawyer?
>
> A. [Petitioner]: No.
>
> Q. [Prosecutor]: If you wanted everybody to know your side why didn't you tell it to the police officer?
>
> [Defense counsel]: Objection, Your Honor.
>
> THE COURT: Will be sustained.
>
> [Prosecutor]: That's all the questions I have.

20

*Id.*, at \*2-3. This Court then distinguished the facts of *Buxton* from those of *Boyd*, finding that "the circuit court did not allow the constitutionally impermissible evidence to be presented to the jury. This distinction is critical to our conclusion in the present case that the prosecutor's unanswered question did not constitute error" *Id.*, at 4. In this case, following a bench conference, the State did not press for an answer to the clearly impermissible question it asked. Thus, like in *Buxton*, the question was and remains unanswered and the State never thereafter "suggest[ed] that [Petitioner's] silence is indicative of guilt." *State v. Bruffey*, 231 W. Va. 502, 510, 745 S.E.2d 540, 548 (2013).

From our review, we believe it appropriate to apply a harmless error analysis to instances where a defendant's silence is referenced during trial. Indeed, we have previously held that harmless error is a firmly established doctrine in West Virginia, even for constitutional errors at trial. "The remedial doctrines of knowing and intelligent waiver and harmless error are firmly established by statute, court rule and decisions as salutary aspects of the criminal law of this State." Syl. Pt. 4, *State v. Blair*, 158 W. Va. 647, 214 S.E.2d 330 (1975). "In a constitutional context, the doctrine is also applied because appellate courts are not bound to reverse for a technical violation of a fundamental right." *Id.*, 158 W. Va. at 659, 214 S.E.2d at 337. In the case of constitutional errors at trial, "[f]ailure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syl. Pt. 5, *Id.* This rule has been

21

applied in other jurisdictions where prosecutors have commented upon a defendant's silence:

> Indeed, the general rule around the country is that "improper comments on a defendant's invocation of his right to remain silent are subject to a harmless error analysis and need not require reversal if the Court is convinced, beyond a reasonable doubt, that the error did not contribute to the verdict." *Jones v. State*, 748 So.2d 1012, 1021-1022 (Fla.1999). *See also Taylor v. State*, 254 Ga. App. 150, 561 S.E.2d 833, 836 (2002) ("Even if we assume that there was an improper comment on [defendant's] silence, such an impropriety does not automatically require reversal and may be harmless error."); *State v. Tucker*, 138 Idaho 296, 62 P.3d 644, 647 (Ct. App. 2003) ("Commentary on a defendant's right to remain silent, if determined to be constitutional error, is subject to the harmless error analysis[.]"); *State v. Ezzell*, 642 S.E.2d 274, 278 (N.C.Ct.App. 2007) ("[A] comment implicating a defendant's right to remain silent, although erroneous, is not invariably prejudicial. Indeed, such error will not earn the defendant a new trial if, after examining the entire record, this Court determines that the error was harmless beyond a reasonable doubt."); *State v. Shuler*, 353 S.C. 176, 577 S.E.2d 438, 444 (2003) ("While the State may not comment on the defendant's right to remain silent, an improper reference is subject to harmless error analysis.").

*State v. Murray*, 220 W. Va. 735, 745, 649 S.E.2d 509, 519 (2007) (Davis, C.J., dissenting).

In this case, we believe it is clear the error in briefly referencing Hoard's silence was harmless beyond a reasonable doubt. There were two instances in which the State referred to Hoard's silence. The first occurred during opening statements on day one of the trial. The second was during cross-examination of Hoard on day six of the trial. We believe that two isolated references to Hoard's silence spread across a full calendar week,

22

a record of nearly 3,000 pages, and the lack of emphasis on the two isolated instances at any other point in the trial, constitutes harmless error. This is particularly true because it is clear that the evidence of guilt proven at trial was quite extensive. The State produced evidence proving that after being forcibly removed from Shorthorns, Hoard went to his truck, opened the truck door, opened his briefcase, and retrieved his gun. He then stood on the running board of the truck and fired four shots into the night sky. He then fired the gun in a downward direction and four bullets struck Grant, killing him. Immediately following the incident, Hoard fled the scene, returning to Teets' home and later traveled to his home outside Morgantown. Hoard turned off his cell phone and deleted his Facebook page. Finally, he removed the distinctive truck topper from his truck. The State also established a motive – Hoard was angry at Felton for his part in removing Hoard from Shorthorns – that also points to Hoard's guilt. We believe that there was overwhelming evidence of Hoard's guilt that the jury considered in rendering its verdict and it is clear beyond a reasonable doubt that, without the two isolated references to Hoard's silence, the jury would have nonetheless returned a guilty verdict.

*B. Jury Instructions*

We note at the outset that no specific objections were raised to the circuit court regarding the given instructions during trial. Only a general objection, noted above, was lodged regarding the jury instructions. Objections to jury instructions must be specific

23

and must be raised prior to closing argument. "No party may assign as error the giving or refusal to give an instruction … unless that party objects thereto before the arguments to the jury have begun, stating distinctly the matter to which that party objects and the grounds of the objection." Rule 30, W. Va. R. Cr. P. Now, we turn to each of the issues raised regarding the jury instructions.

### 1. Self Defense Instructions

The circuit court gave a slightly modified version of Hoard's proposed instruction 31 on self-defense. The given instruction informed the jury that if Hoard was not the aggressor, and he reasonably believed he was in imminent danger of death or serious bodily injury, he had the right to employ deadly force to defend himself. The jury was also instructed that Hoard could not provoke the assault and that if a similarly situated reasonably prudent person had a reasonable belief that that he was about to be killed or subjected to serious bodily injury, and Hoard actually believed that he was in imminent danger of death or serious bodily injury, he could use deadly force to repel it. Finally, the jury was told that if evidence of self-defense was present, the State had to prove beyond a reasonable doubt that Hoard did not act in self-defense.

We have previously held that "[t]he trial court must instruct the jury on all essential elements of the offenses charged, and the failure of the trial court to instruct the jury on the essential elements deprives the accused of his fundamental right to a fair trial, and constitutes reversible error." Syl., *State v. Miller*, 184 W.Va. 367, 400 S.E.2d 611

24

(1990).  However, "[i]t is not error to refuse to give an instruction to the jury, though it states a correct and applicable principle of law, if the principle stated in the instruction refused is adequately covered by another instruction or other instructions given." Syl. Pt. 3, *Morgan v. Price*, 151 W.Va. 158, 150 S.E.2d 897 (1966).   We are required to review the jury instructions as a whole.  *See* Syl. Pt. 2, *Roberts v. Stevens Clinic Hosp., Inc.*, 176 W. Va. 492, 345 S.E.2d 791 (1986).

Hoard argues that the circuit court erred in not giving his proposed jury instructions 22, 23, 24, and 25 on self-defense.[10]  Based upon our review of the self-defense instruction given and the proposed instructions not given, we conclude that proposed instructions 22, 23, 24, and 25 were cumulative of the self-defense instruction that was given and are duplicative of each other.  Moreover, the self-defense instruction given by the circuit court was an accurate statement of the law.  As such, we find no error.

*2.  Intent Instructions*

Next, Hoard argues that the circuit court erred in giving instructions on intent crimes, because the State failed to prove the element of intent.  Hoard argues that the circuit

---

[10] Proposed instruction 22 cited to "*State v. Gibson*, 186 W. Va. 465, 413 S.E.2d 120 (1991)."  Proposed instruction 23 cited to "*State v. Donahue*, 79 W. Va. 260, 265, 90 S.E. 834 (1916); *State v. Cain*, 20 W. Va. 679, 707 (1882); *State v. Clark*, 51 W. Va. 457, 468, 41 S.E. 204 (1902); and, *State v. DeBoard*, 119 W. Va. 396, 407, 194 S.E. 349 (1937)."  Proposed instruction 24 cited to "*Gibson*."  Proposed instruction 25 cited to "*State v. Manns*, 48 W. Va. 480, 486, 37 S.E. 613 (1900); *State v. Hamrick*, 74 W. Va. 145, 81 S.E. 703 (1914); and, *State v. Banks*, 99 W. Va. 711, 715, 129 S.E. 715 (1925)."

court erred in giving instructions for the crimes of first-degree murder, second-degree murder, and voluntary manslaughter, all requiring the State to prove the specific intent to kill. *See Guthrie*, 194 W. Va. at 673-74, 461 S.E.2d at 179-80 (first-degree and second-degree murder require intent to kill); *State v. Drakes*, 243 W. Va. 339, 348, 844 S.E.2d 110, 119 (2020) (intent to kill is an element of voluntary manslaughter).

Hoard alleges there was insufficient evidence to support the instructions on intent and points us to two cases for the proposition that only jury instructions supported by the evidence should be given at trial. *See* Syl. Pt. 12, *State v Henson*, 239 W. Va. 898, 806 S.E.2d 822 (2017); Syl. Pt. 5, *State v. Bowling*, 232 W. Va. 529, 753 S.E.2d 27 (2013). We are mindful that:

> Whether facts are sufficient to justify the delivery of a particular instruction is reviewed by this Court under an abuse of discretion standard. In criminal cases where a conviction results, the evidence and any reasonable inferences are considered in the light most favorable to the prosecution.

Syl. Pt. 12, *Derr*.

The evidence adduced at trial supported the circuit court's instructions to the jury and the circuit court did not abuse its discretion in giving the intent instructions. Hoard went to his truck, opened the door, opened his briefcase, retrieved his gun, stood on the running board of his truck, fired four shots into the night sky, turned the gun in a downward direction, fired four bullets into Grant, resulting in his death. From these facts, there was sufficient evidence presented to the jury from which it could conclude that Hoard intended

26

to kill Grant. Accordingly, the circuit court did not err in giving instructions on the crimes of first-degree murder, second-degree murder, and voluntary manslaughter.

### 3. *Malice Instructions*

Finally, Hoard argues that the circuit court erred in instructing the jury twice on malice. The circuit court included the same instruction on malice in its instruction on first-degree murder as it did in its instruction on second-degree murder. The circuit court gave the following instruction as to first-degree murder and repeated it as to second-degree murder by simply replacing the term "first degree" with "second degree":

> In order to find [Hoard] guilty [of] murder of the first degree [second degree] you must find that [Hoard] acted with malice. Malice is the intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply and evil intent. Malice is also a condition of the mind showing a heart fatally bent on mischief, without regard to social duty. Malice is a term of art importing wickedness and excluding a just cause or excuse.

> The word malice, as used in these instructions, is used in a technical sense. It may be either express or implied and includes not only anger, hatred and revenge, but other unjustifiable motives. It may be inferred or implied by you from all of the evidence in this case if you find such inference is reasonable from the facts and circumstances of this case which have been proven to your satisfaction beyond a reasonable doubt. It may be inferred from any deliberate and cruel act done by [Hoard], without any reasonable provocation or excuse, however sudden. Malice is not confined to ill-will toward any one or more particular person, but malice is every evil design in general; and by it is meant that the fact has been attended by such circumstances as are ordinarily symptoms of a wicked, depraved and malignant spirit, and carry with them the plain indications of a heart, regardless of social duty, fatally

27

bent upon mischief. It is not necessary that malice must have existed for any particular length of time. It is sufficient if malice springs into the mind before the accused did the killing.

Malice and intent to kill, which must be proven beyond a reasonable doubt, can be inferred by the jury from [Hoard's] use of a deadly weapon if you believe by proof beyond a reasonable doubt that [Hoard] did use a deadly weapon under circumstances which you do not believe afforded [Hoard] excuse, justification, or provocation for his conduct. If you believe there was legal justification, excuse, or provocation, the inference of malice does not arise and malice must be established beyond a reasonable doubt independently without the aid of the inference.

The court instructs the jury that if you believe there was legal justification, excuse or provocation for [Hoard's] conduct, you may not infer malice from the use of a deadly weapon. If you have found there was legal justification, excuse or provocation for Hoard's conduct, the State must prove malice beyond a reasonable doubt independently and without the aid of the inference. You are not obligated to find, however, and you may not find [Hoard] guilty unless you are satisfied that the State has proven the element of malice beyond a reasonable doubt.

Malice is a required element of both first-degree and second-degree murder. *See Gibson*, 186 W. Va. at 471, 413 S.E.2d at 126 ("[M]urder in the first degree is when one person kills another unlawfully, maliciously, deliberately, and premeditatedly. . . ."); Syl. Pt. 2, in part, *Drakes* ("Murder in the second degree is the unlawful, intentional killing of another person with malice…"). Thus, as we noted above, the circuit court was required to "instruct the jury on all essential elements of the offenses charged, and the failure of the trial court to instruct the jury on the essential elements deprives the accused of his fundamental right to a fair trial, and constitutes reversible error." Syl., *Miller*.

28

In general, the question on review of the sufficiency of jury instructions is whether the instructions as a whole were sufficient to inform the jury correctly of the particular law and the theory of defense. We ask whether: (1) the instructions adequately stated the law and provided the jury with an ample understanding of the law, (2) the instructions as a whole fairly and adequately treated the evidentiary issues and defenses raised by the parties, (3) the instructions were a correct statement of the law regarding the elements of the offense, and (4) the instructions meaningfully conveyed to the jury the correct burdens of proof. Thus, a jury instruction is erroneous if it has a reasonable potential to mislead the jury as to the correct legal principle or does not adequately inform the jury on the law. An erroneous instruction requires a new trial unless the error is harmless. *See State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975).

*State v. Miller*, 197 W. Va. 588, 607, 476 S.E.2d 535, 554 (1996).

In this case, we easily conclude that the trial court's instructions were sufficient. Hoard argues that "it is clear that [Hoard] was prejudiced" by the giving of the duplicative instructions. However, the two cases cited by Hoard do not support that proposition. *State v. Pannell*, 175 W. Va. 35, 330 S.E.2d 844 (1985) merely discusses in passing the potential for a future case where there is "selective re-reading of instructions" upon request by the jury causing unfair prejudice. *Id.*, 175 W. Va. at 39, 330 S.E.2d at 848. That is not at all what happened in this case. In fact, the holding in *Pannell* states:

The giving of an incomplete instruction does not constitute reversible error where consideration of the instructions as a whole cures any defect in the incomplete instruction.

Syl. Pt. 1, *Id.*

29

The other case cited by Hoard is from the United States District Court for the Central District of California. *See Mendoza v. Sullivan*, Case No.: 8:19-cv-00622-MAA, 2021 WL 310937 (C.D. Ca. Jan. 29, 2021). This case also fails to support Hoard's position. First, *Mendoza* was a collateral attack upon a conviction. *Id*. at 1. Second, the instruction given in *Mendoza* correctly stated the law. *Id*. at 11. Finally, the *Mendoza* court affirmed the giving of duplicative instructions. *Id*. at 12 ("Even if the instruction was somewhat repetitive or duplicative, Mendoza fails to demonstrate a trial court commits reversible error simply by giving a redundant instruction which is otherwise clear, impartial, and accurate.").

The decision to give the malice instruction twice may have been redundant, but there was no harm in repeating the same instruction regarding malice with each of the two murder instructions. It accurately informed the jury of the elements of first-degree and second-degree murder. We conclude that the instructions as a whole adequately stated the law, fairly treated the issues and defenses of the parties, correctly stated the elements of the crimes, and properly instructed on the burdens of proof. The circuit court did not err in giving duplicative instructions on malice.

## C. Jury Selection

Prior to trial, Hoard sought a change of venue and/or permission to conduct a survey of residents of Preston County to determine sentiment and opinions about this case. The impetus for the survey arose from preliminary review of social media following

30

the murder that showed multiple instances of people sharing and commenting about it. Hoard did not show that the persons making such social media comments were residents of Preston County and the circuit court denied the motion for a survey. As for the change of venue motion, the circuit court did not immediately rule on the motion and held it in abeyance pending the outcome of jury selection.[11]

West Virginia's Constitution provides:

> Trials of crimes, and of misdemeanors, unless herein otherwise provided, shall be . . . in the county where the alleged offence was committed, unless upon petition of the accused, and for good cause shown, it is removed to some other county.

---

[11] The following discussion was had regarding this point:

Ms. Haynie: And I want to put on the record, of course, my continuing motion for change of venue.

THE COURT: So noted. Yup. And if we cannot sit a jury – I mean, you know, we are trying to get 32 jurors, and if I can't sit a panel of jurors, then we'll have to look at that; but if I can sit a panel of jurors that can be – render a verdict true and accurate based solely upon the facts presented within the four walls of the courtroom, then, basically, you know, I think he has received a fair trial.

Ms. Haynie: Well, I mean, I am sure we'll be renewing the motion. I just wanted to make it on – make the record.

THE COURT: Yeah. And I will give you a continuing, you know, motion.

Ms. Haynie: Okay.

W. Va. CONST. art. III, § 14, in part. Our Legislature has provided that, "[a] court may, on the petition of the accused and for good cause shown, order the venue of the trial of a criminal case in such court to be removed to some other county." W. Va. Code § 62-3-13 (1923). This protection for defendants in criminal matters is also contained in West Virginia's Rules of Criminal Procedure:

> The circuit court upon motion of the defendant shall transfer the proceedings as to that defendant to another county if the circuit court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he or she cannot obtain a fair and impartial trial at the place fixed by law for holding the trial.

W. Va. R. Cr. P. 21(a).

In support of their respective positions, both parties point us to the first three Syllabus Points of *State v. Derr*:

> 1. "'To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.' Point 2, Syllabus, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946)." Syllabus Point 1, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978).
>
> 2. "'A present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial, is good cause for removing the case to another county.' Point 2, Syllabus, *State v. Dandy*, 151 W.Va. 547, 153 S.E.2d 507 (1967), *quoting* Point 1, Syllabus, *State v. Siers*, 103 W.Va.

32

30, 136 S.E. 503 (1927)." Syllabus Point 2, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978).

3. One of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant.

Syl Pts. 1-3, *Derr*. Widespread publicity, however, does not by itself, require a change of venue. *See* Syl. Pt. 2, *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966).

After three days of jury selection, including individual *voir dire* of all members of the pool from which the jury was selected, an impartial jury was seated. The circuit court was satisfied that there was no present hostile sentiment against Hoard necessitating moving the case out of Preston County or to conduct the pre-trial survey. In fact, during jury selection, counsel for Hoard stated that information obtained during their investigation of prospective jurors was used to guide their actions.[12]

---

[12] At one point during jury selection, Hoard's counsel stated, "Well, I mean, here's what I am going to say. I am pleasantly surprised that the people have been honest, because the people who have already excused – have already told us, *we already knew that they could not sit on this jury based upon our research*." (emphasis added)

As *voir dire* progressed, this discussion was had:

THE COURT: . . . Now this next juror is the one that didn't want to come that I had to threaten to have somebody go get him today, so probably going to be a little hostile, so.

Ms. Haynie: Well, he lives right down the road from Heidi Felton, so.

(continued . . .)

Further, the arguments raised by Hoard as to four specific jurors, (1, 21, 24, 34), were not preserved as Hoard made no motions to strike these specific jurors for cause. Hoard affirmatively states in his brief that the circuit court denied motions to strike these four jurors for cause. However, the record reflects that no such motions were made to strike these four jurors.[13] Our Rules of Appellate Procedure require that "[t]he argument

THE COURT: Who does?

Ms. Haynie: [Juror 35]

THE COURT: Oh, does he? *You guys know a lot of stuff I don't.*

Ms. Haynie: *Yeah. I mean, if our information is correct.*

(emphasis added).

[13] Additionally, these jurors clearly stated, following lengthy individual *voir dire*, that they could render a fair verdict. Juror 1 was asked by the circuit court, "So do you think based upon all the witnesses we've talked about and your knowledge of the case, would you be able to sit and render a verdict true and accurate based solely upon the facts of this case?" Juror 1 answered, "Yes."

As to Juror 21, the following colloquy took place:

Ms. Haynie: So if you were selected as a juror in this case and you were – had listened to all of the evidence and had come to a conclusion in your own mind about what you thought the verdict should be, if that verdict was not what maybe the community would want you to render would you – is there pressure there that you would not want to be under or would you be able to render the verdict that you felt was true?

(continued . . .)

34

[Juror 21]: I would be able to do what I felt was correct.

Juror 24 was also questioned by Hoard's counsel:

Ms. Haynie: Okay. If you were selected to sit as a juror in this case, could you take whatever you heard about this case through social media or news or your husband or whatever, set it aside, and render a verdict in this case based solely on what you hear in the courtroom?

[Juror 24]: Yeah.

Ms. Haynie: Okay. If you sat as a juror in this case and after listening to all the evidence had come in [sic] your own mind and heart to a verdict that you thought was just and true, would you feel pressure to render a different verdict because of the – the community pressure to render a different verdict than what you felt was true in your heart, or would you go ahead and render that verdict that you felt was true despite what the community might feel or think?

[Juror 24]: I think that the – it has to be proven that he's guilty or not.

Ms. Haynie: Okay.

[Juror 24]: You know, I mean, evidence has to prove that.

Ms. Haynie: Okay. So even if you sat as a juror and you thought maybe the State didn't meet it's [sic] burden, you would still find Mr. Hoard not guilty even if you knew that maybe your family – or I'm sorry, community members disagreed with you?

[Juror 24]: Yeah.

Finally, Juror 34 had the following exchange with Hoard's counsel:

(continued . . .)

must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal." W. V. R. App. P. 10(c)(7).

Hoard points us to the circuit court's order denying his motion for a new trial and motion for judgment of acquittal in support of the proposition that the circuit court denied motions to strike these four jurors for cause. The circuit court's order makes no mention of whether Hoard properly moved to strike these jurors for cause. Although the same section of Hoard's brief does contain pinpoint citations to the transcript, it fails to point to any place in the transcript where Hoard actually moved to strike these four jurors.

---

Ms. Haynie: Yeah, okay. If Mr. Felton – Michael Felton testifies in this case and gives conflicting testimony with another witness that you don't know, would you believe Mr. Felton's testimony over the other witness solely because you knew him or you were his acquaintance?

[Juror 34]: Testimony is considered as evidence, right?

Ms. Haynie: Uh-huh.

[Juror 34]: It's all about the facts.

Ms. Haynie: Okay.

[Juror 34]: So[,] to answer your question, no, I would not give – show any type of – be impartial to either or.

Ms. Haynie: Solely because you knew him, right? You would listen to all the evidence and weight out everything?

[Juror 34]: Right.

Our thorough review of the transcript reveals no such motions. Because Hoard has failed to demonstrate that he moved to strike these jurors, and the circuit court conducted thorough individual *voir dire* of each such juror which resulted in its conclusion that each juror could render an impartial verdict, we find no error.

### D. Cumulative Error

Finally, Hoard argues that cumulative errors resulted in him being denied his constitutional right to a fair trial and the circuit court erred in denying his motion for judgment of acquittal. Cumulative error exists:

> Where the record of a criminal trial shows that the cumulative effect of *numerous errors* committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error.

Syl. Pt. 5, *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972) (emphasis added). For this doctrine to apply, "there must be more than one harmless error." *State v. McKinley*, 234 W.Va. 143, 167 n.22, 764 S.E.2d 303, 327 n.22 (2014). We previously found that one error cannot constitute cumulative error:

> In an attempt to locate reversible error, Appellant cites to four evidentiary rulings that the trial court made that, taken together, should require reversal under the doctrine of cumulative error.
> . . . .
> While the State concedes that one of the four enumerated evidentiary rulings was error, it argues that the other evidentiary rulings relied upon by Appellant were not an abuse of the trial court's discretion. We agree. Accordingly, we do not find cumulative error justifying a reversal of Appellant's conviction.

*State v. Cook*, 228 W. Va. 563, 571-2, 723 S.E.2d 388, 396-7 (2010) (footnotes omitted).

Here, we found the circuit court committed harmless error by concluding that the brief references to Hoard's pre-trial silence did not violate his protection against self-incrimination. These harmless errors were clearly insignificant in a record of nearly 3,000 pages. Although the limited references constituted error, it is clear that as to the doctrine of cumulative error, "[i]f the errors, while numerous, are insignificant or inconsequential, the case should not be reversed under the doctrine." 1 Louis J. Palmer, Jr., *Handbook on Evidence for West Virginia Lawyers*, § 103.03[1][e], p. 40 (7th ed. 2021) (footnote omitted). Thus, we find no cumulative error in this matter.

## IV. CONCLUSION

For the foregoing reasons, we affirm Hoard's conviction and sentencing by the circuit court.

Affirmed.